FILED
United States Court of Appeals
Tenth Circuit

September 26, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

RURAL WATER DISTRICT NO. 4,
DOUGLAS COUNTY, KANSAS,

   Plaintiff-Appellee/
   Cross-Appellant,

  v.

CITY OF EUDORA, KANSAS,

   Defendant-Appellant/
   Cross-Appellee.

Nos. 09-3282 & 09-3299

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS
(No. 2:07-CV-02463-JAR)

_____

Curtis Tideman (David Frye and Jeffrey R. King with him on the briefs), of
Lathrop & Gage LLP, Overland Park, Kansas, for Defendant-Appellant/Cross-
Appellee.

Steven M. Harris of Doyle Harris Davis & Haughey, Tulsa, Oklahoma (Michael
D. Davis of Doyle Harris Davis & Haughey; John W. Nitcher of Riling Burkhead
& Nitcher, Lawrence, Kansas, with him on the briefs) for Plaintiff-
Appellee/Cross-Appellant.

_____

Before **TYMKOVICH**, **McKAY**, and **GORSUCH**, Circuit Judges.

_____

**McKAY**, Circuit Judge.

_____

This appeal arises out of a dispute between a city and a rural water district over their rights to serve customers in several recently annexed areas of Douglas County, Kansas. Rural Water District No. 4 ("Douglas-4" or "the District") brought this suit against the city of Eudora under 42 U.S.C. § 1983, alleging the City violated Douglas-4's exclusive right to provide water service to current and prospective customers in violation of 7 U.S.C. § 1926(b). On appeal, this court is asked to resolve a host of federal and state legal issues concerning the competitive relationship between a dueling water district and local municipality. Finding jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

## BACKGROUND

The parties are well aware of the facts, which we will not repeat in detail. In basic form, Douglas-4 was created to provide water service to areas of Douglas County, Kansas. Its purpose under Kansas law is to provide water to "promote the public health, convenience and welfare" of the community. *See* K.S.A. § 82a-614. Under its own bylaws, Douglas-4 was developed, inter alia, to "acquire water and water rights and to build and acquire pipelines and other facilities, and to operate the same for the purpose of furnishing water for domestic, garden, livestock and other purposes to owners and occupants of land located within the District, and others as authorized by these By-Laws." (Appellant's Add. at 7.) To further its purpose, it is also authorized to borrow money, secure loans, and enter into contracts or cooperate with any person or governmental agency. (*Id.* at

-2-

7-8.)

Beginning in 2000, Douglas-4 developed and then enacted a plan to increase its service area and effectiveness by purchasing water from a nearby water district to meet increasing demand from existing and prospective customers, but it needed to borrow $1.25 million to finance construction of new infrastructure in order to exploit its new water source. It first secured a loan for the full amount from the Kansas Department of Health and Environment ("KDHE"), but upon a recommendation by the District's administrator, it decided to obtain part of its financing from a private bank backed by a federal guarantee from the U.S. Department of Agriculture ("USDA"). Ultimately, Douglas-4 decided to separate its debt into two loans: the first $1 million from the KDHE and the remaining $250,000 from First State Bank & Trust, a private bank. First State in turn entered into a guarantee agreement with Rural Development, a lending branch of the USDA. Douglas-4 does not deny that it pursued the guaranteed loan specifically for the added benefit of § 1926(b) protection, despite the additional costs to the District in the form of higher closing fees and interest rates.

In 2006, the city of Eudora, which also provides water service within its boundaries, annexed several areas around the southern edge of its city limits: Fairfield Addition (also known as the "Garber Property"), Meadow Lark Property, Grinnell Property, and Kurtz Addition. From May to September 2007, both

Douglas-4 and Eudora repeatedly contacted the Fairfield Addition's owner, Doug Garber, to discuss his water needs. After the City's annexation, Douglas-4 notified Mr. Garber it possessed the exclusive right to provide water service to his property. It also exchanged correspondence with Mr. Garber regarding cost estimates and a timeline to begin water service. For its part, Eudora informed Mr. Garber it knew he intended to obtain water from Douglas-4 but it was still willing to work with him to provide water service. Eudora also informed Mr. Garber that it might de-annex his property should he refuse its water service.

Leading up to and during this same period, the parties communicated extensively with each other. From 2004 to mid-2007, Douglas-4 and Eudora engaged in a series of discussions regarding changes to both parties' territories as a result of the City's annexations. The parties held what would ultimately result in failed negotiations for a repurchase plan, to ensure that Douglas-4 could remain financially viable as Eudora annexed portions of Douglas-4's service area and began serving water to Douglas-4's customers.

Once the Garber property was annexed and Douglas-4 began speaking to Mr. Garber about water service, Douglas-4 notified Eudora that attempts by the City to provide water to the Garber property would violate the District's right to protection under § 1926(b). However, Eudora sought to continue where the failed negotiations ended. It notified Douglas-4 that, unless Douglas-4 submitted to an appraisal to sell its assets to Eudora by the end of September, the City would file

-4-

suit to compel the District's compliance. Rather than accept the City's demands, Douglas-4 filed a complaint with the district court.

During the course of litigation, the district court issued several critical orders in which it denied both parties' motions for summary judgment, denied Eudora's motions in limine to exclude certain communications by City officials regarding attempts to provide water service to the affected areas, and rejected proposed jury instructions submitted by both parties. At the conclusion of a ten-day trial, the case was submitted to the jury by way of special interrogatories. The jury found that Douglas-4 had obtained § 1926(b) protection and Eudora had violated § 1926(b) in each of the disputed areas.[1] The district court then enjoined Eudora from serving or limiting Douglas-4's service to these areas. Eudora's appeal and Douglas-4's cross-appeal followed.

**DISCUSSION**

"Where a jury instruction is legally erroneous, we must reverse if the jury might have based its verdict on the erroneously given instruction." *City of*

---

[1] According to the verdict form, the jury first answered "yes" to the general question of whether Douglas-4 had the power under Kansas law to cooperate with and enter into agreements with the federal government. It then determined for each affected property that Douglas-4 made water service available and that Eudora had limited or curtailed Douglas-4's water service. The jury also entered for each property the amount of damages. Specifically, the jury determined that $23,500.00 in damages arose from the Garber property and $1.00 in nominal damages arose from each of the three other properties. (*See* Appellant's App. at 1666-1669.)

*Wichita, Kan. v. U.S. Gypsum Co.*, 72 F.3d 1491, 1495 (10th Cir. 1996). We therefore review de novo whether the district court's jury instructions correctly stated the governing law. *See United States v. Platte*, 401 F.3d 1176, 1183 (10th Cir. 2005); *Cann v. Ford Motor Co.*, 658 F.2d 54, 58 (2d Cir. 1981) ("We will reverse a judgment entered upon answers to questions . . . which inaccurately frame the issues to be resolved by the jury."). We review evidentiary rulings for abuse of discretion and will not reverse unless the challenging party shows that the ruling was "based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 799 (10th Cir. 2001).

In addition to appealing the district court's legal conclusions, jury instructions, and admissions of evidence, Eudora challenges the sufficiency of the evidence at each step of the § 1926(b) analysis. It was required to renew these challenges at the close of all the evidence in a motion for judgment as a matter of law under Rule 50(a) and again after the entry of judgment as a renewed motion under Rule 50(b).[2] Having failed to file a Rule 50(b) motion, Eudora has waived

---

[2] Eudora claims the district court never entered a final judgment, and thus the time to file a 50(b) motion has yet to expire. Even if the district court did not enter a final judgment, we may nevertheless invoke jurisdiction under 28 U.S.C. § 1291. *See Bankers Trust Co. v. Mallis*, 435 U.S. 381, 386-88 (1978); *Burlington N. R.R. Co. v. Huddleston*, 94 F.3d 1413, 1416 n.3 (10th Cir. 1996) ("Because the district court's order granted Plaintiff its requested relief and effectively terminated the action, we may properly exercise appellate jurisdiction over this

(continued...)

any challenges on appeal to the sufficiency of the evidence, *see Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006), including challenges to any decisions at summary judgment where the facts were in dispute, *see Haberman v. Hartford Ins. Gr.*, 443 F.3d 1257, 1264 (10th Cir. 2006). However, it may still challenge the district court's decisions pertaining to issues of law, *see Wilson v. Union Pac. R.R.*, 56 F.3d 1226, 1229 (10th Cir. 1995), jury instructions, *see Kelley v. City of Albuquerque*, 542 F.3d 802, 818-20 (10th Cir. 2008), and the admission of evidence, *see* Fed. R. Evid. 103(a).

This court has thoroughly reviewed the history and purpose of 7 U.S.C. § 1926(b) in several recent opinions, and we need not repeat it again here. *See, e.g.*, *Rural Water Sewer & Solid Waste Mgmt. v. City of Guthrie*, Nos. 08-6003 & 08-6066, 2011 WL 3000591 (10th Cir. July 25, 2011); *Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694 (10th Cir. 2004); *Rural Water Dist. No. 1 v. City of Wilson, Kan.*, 243 F.3d 1263 (10th Cir. 2001); *Sequoyah Cnty. Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192 (10th Cir. 1999); *Glenpool Util. Servs. Auth. v. Creek Cnty. Rural Water Dist. No. 2*, 861 F.2d 1211 (10th Cir. 1988). For a water district indebted by a qualifying loan to the federal government,

---

[2](...continued)
appeal under § 1291."). However, given the absence of a 50(b) motion, Eudora is still unable to challenge the sufficiency of the evidence.

> [t]he service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan.

7 U.S.C. § 1926(b). To receive this protection, a water district must have both a continuing indebtedness to the USDA[3] and have provided or made available service to the disputed area. *See Pittsburg Cnty.*, 358 F.3d at 713. "Doubts about whether a water association is entitled to protection from competition under § 1926(b) should be resolved in favor of the [USDA]-indebted party seeking protection for its territory."[4] *Sequoyah Cnty.*, 191 F.3d at 1197. If the water district is entitled to protection, it then must prove that its services were curtailed or limited by the competing entity. *See Pittsburg Cnty.*, 358 F.3d at 716.

We now turn to the first element of § 1926(b): Douglas-4's qualifying indebtedness.

**A. Douglas-4's cooperation to secure a USDA loan guarantee may qualify it as an indebted association under § 1926(b), but only if its cooperation was necessary to carry out its organizational purpose.**

---

[3] The USDA has operated the loan and guarantee program since 1994. *See Pittsburg Cnty.*, 358 F.3d at 701 n.1; United States Dept. Of Agriculture, Rural Development Loan Assistance, www.rurdev.usda.gov/RD_Loans.html (last visited Aug. 15, 2011).

[4] This presumption does not mean, as Douglas-4 claims, that all doubts and evidentiary uncertainties must be resolved in favor of the indebted water district or that the City must meet a "clear and convincing" standard on every issue for which it carries the burden of proof. Rather, we simply note that "[e]very federal court to have interpreted § 1926(b) has concluded that *the statute* should be liberally interpreted." *Sequoyah Cnty.*, 191 F.3d at 1197 (emphasis added).

*1. Federal and State Law empower Douglas-4 to cooperate for and accept the benefits of a federal guarantee.*

To obtain protection, a water district must first show it has a qualifying, continued indebtedness to the federal government, as the water district is protected only "during the term of such loan." 7 U.S.C. § 1926(b). Under Section 1926(a), "such loans" include loans the government makes or insures, *see id.* § 1926(a)(1), and loans the government guarantees, *see id.* § 1926(a)(24). Therefore, under § 1926(b), the federal guarantee of Douglas-4's private loan may be considered one "such loan" for purposes of meeting the requirements of § 1926(b).

In addition to meeting the requirements set forth in § 1926(b), a water district's qualifying action (i.e. assumption of the qualifying loan or guarantee) must also fall within its enumerated powers under state law. As a quasi-municipal corporation, *see Dedeke v. Rural Water Dist. No. 5*, 623 P.2d 1324, 1331 (Kan. 1981), a rural water district possesses only those powers given to it by law or as may necessarily be implied to give effect to powers specifically granted, *see Wiggins v. Hous. Auth. of Kansas City*, 916 P.2d 718, 720 (Kan. Ct. App. 1996); *Hous. Auth. of Kaw Tribe of Indians of Okla. v. City of Ponca City*, 952 F.2d 1183, 1192 (10th Cir. 1991) ("Since political subdivisions are creatures of the state, they possess no rights independent of those expressly provided to them by the state."). Indeed, "any reasonable doubt as to the existence of a particular

power must be resolved against its existence." *Wiggins*, 916 P.2d at 721. The state, by limiting a rural water district's powers, is "ultimately free to reject both the conditions and the funding [of federal loans], no matter how hard that choice may be." *Pittsburg Cnty.*, 358 F.3d at 718.

Turning then to K.S.A. § 82a-619, the statute that enumerates a rural water district's powers, there is only one clause under which Douglas-4 may claim authority to accept a federal loan guarantee. Specifically, Douglas-4 may "cooperate with and enter into agreements with the secretary of the United States department of agriculture or the secretary's duly authorized representative necessary to carry out the purposes of its organization."[5] K.S.A. § 82a-619(g). Thus, Douglas-4 must have either cooperated or entered into an agreement with the USDA, and this cooperation or agreement must be necessary to carry out the purposes of its organization.

---

[5] Douglas-4 claims it is also empowered to "accept financial or other aid which the secretary of the United States department of agriculture is empowered to give pursuant to 16 U.S.C.A., secs. 590r, 590s, 590x-1, 590x-a and 590x-3, and amendments thereto," and that this authority does not require that the aid be "necessary" in any form. *See* K.S.A. § 82a-619(g). However, this clause only applies to financial aid provided under the specific federal statutes listed "and amendments thereto." The enumerated statutes, first enacted in 1937, were repealed by the Consolidated Farmers Home Administration Act of 1961 and are of no use to Douglas-4. Nor do we consider Congress's repeal of § 590r *et seq.* and replacement with a radically different statutory scheme in § 1926 an amendment to the repealed sections. *Compare* 7 U.S.C. § 1926(b) (providing annexation protection for qualifying loans), *with* 16 U.S.C. § 590x-3 (no protection from annexation).

Here, although the guarantee agreement was between the USDA and First State Bank, Douglas-4 was the entity that sought the guarantee and hoped to benefit from it. Rural Development, a funding component of the USDA, provided Douglas-4 with a "Conditional Commitment for Guarantee," which outlined the terms and conditions of the guarantee, and Douglas-4 then signed and returned the Commitment documents to Rural Development. This interaction between Douglas-4 and the USDA may qualify as "cooperation" under K.S.A. § 82a-619(g), but the cooperation must be necessary to carry out a purpose of Douglas-4's organization. And in this case, if Douglas-4's cooperation is to be necessary, the guarantee itself must too be necessary.

The district court determined that, in its view, "the guarantee [was] just a piece of" the loan and was not something for which Douglas-4 contracted. (Appellant's App. at 3417). It therefore considered the guarantee and the loan to be "one and the same." (*Id.* at 3402.) Based on this conclusion, it directed the jury at the close of trial to determine whether "the *loan* guaranteed by [the] Federal Government was necessary." (*Id.* at 1648 (emphasis added).)

By allowing the jury to consider the loan as a trigger for Douglas-4's indebtedness, the district court shifted the focus of the jury's inquiry away from the actual subject matter of the cooperation, i.e., the guarantee. Yet while the loan and the guarantee are certainly related, they are not one and the same. A loan may be pursued either with or without a guarantee. Each may be contracted

-11-

for with or without government assistance. Each has its own unique purpose. Generally, a loan functions as a source of funds, *see* USDA Rural Development, Water and Waste Disposal Direct Loans and Grants, www.rurdev.usda.gov/UWP-dispdirectloansgrants.htm (last visited Aug. 15, 2011), whereas a guarantee serves to bolster an organization's existing credit, *see* USDA Rural Development, Water and Waste Disposal Guaranteed Loans, www.rurdev.usda.gov/UWP-dispguaranteedloan.htm (last visited Aug. 15, 2011).

Although each has its own purpose and must be analyzed independently, without a loan there is nothing to guarantee. Thus, for a guarantee to be necessary the underlying loan must also be necessary. The converse, however, is not always true: not every loan gives rise to a guarantee. Therefore, even if the parties would agree that the loan was necessary to carry out the purposes of Douglas-4's organization, Douglas-4 must still prove that its *cooperation with the USDA*—i.e., the guarantee—was also necessary. The jury was not asked to consider this question. This error alone entitles Eudora to a new trial on this one issue.

*2. Douglas-4's cooperation must relate to one of its purposes for the cooperation to be necessary.*

Douglas-4 and Eudora also disagree over what exactly constitutes a "necessary" cooperation or agreement under Kansas law, with both parties challenging the district court's jury instruction on the matter. Instruction No. 17

-12-

first stated that the guaranteed loan must be:

> necessary for: (1) an operational purpose identified under Kansas law and Douglas-4's bylaws; (2) a business purpose identified under Kansas law and Douglas-4's bylaws; or (3) protecting Douglas-4 from impairment of its ability to fulfill an operational or business purposes [sic] identified under Kansas law and Douglas-4's bylaws.
>
> The term "necessary" does not mean there must be showing of absolute need.

(Appellant's App. at 1648.)  The instruction then listed for the jury Douglas-4's purposes under Kansas law and its own bylaws.  Last, the instruction informed the jury:

> Douglas-4 did not have the power under Kansas law to cooperate with and enter into agreements with the Federal Government for the sole purpose of securing federal protection under 7 U.S.C. § 1926(b). If obtaining federal protection under 7 U.S.C. § 1926(b) was Douglas-4's only purpose for cooperating with and/or entering into agreement with the Federal Government, you must enter judgment in favor of Eudora.

(*Id.* at 1649.)

Douglas-4 argues that the Kansas legislature left the determination of necessity to the discretion of the acting water district, and that the burden of proof is upon the party challenging the water district's exercise of discretion to establish that the district's decision was the result of fraud, bad faith, or abuse of discretion.  *See, e.g.*, *Steele v. Mo. Pac. R.R. Co.*, 659 P.2d 217, 222 (Kan. 1983) (applying a "reasonable discretion" standard to determine the necessity of a railroad's exercise of eminent domain).  Eudora in turn argues that Kansas's

-13-

statutory scheme does not permit Douglas-4 to claim that monopoly protection—or the strength of its business that would result from such protection—is necessary to its organization. Nor, it claims, does any statute grant Douglas-4 reasonable discretion or a presumption to determine for itself whether a loan or guarantee is necessary.

The legislature did not further define in K.S.A. § 82a-619 the meaning of "necessary to carry out the purposes of [a water district's] organization." However, parallel language exists, at least in part, across Chapter 82a. Other than two similar occurrences within § 619(e) and § 619(h), the only identically worded limitation in Chapter 82a is found in § 606, which authorizes rural water supply districts to "construct, install, maintain and operate such dams, wells and other works and such appurtenant structures and equipment as may be necessary to carry out the purposes of its organization."[6] But while the Kansas legislature limited rural water and water supply districts' exercise of some powers to those actions necessary to the purposes of their organizations, it expressly granted discretionary power in other circumstances. *See* K.S.A. § 82a-610 (authorizing a water supply district board to levy maintenance fees of "such amount as in its judgment is necessary to properly maintain and operate such works"); *id.* § 82a-644 (authorizing water district boards to change the bylaws of consolidated

---

[6] The same language can also be found outside of Section 82a in K.S.A. § 19-3531 and § 80-1618.

districts "as the directors shall deem necessary"); *id.* § 82a-1028 (authorizing groundwater management districts to buy and sell water and property rights that, "in the opinion of the board, [are] deemed necessary or convenient"). Other sections employ different language that may at first appear restrictive, but would likely result in a similar grant of discretion. *See, e.g.*, *id.* § 82a-618 (directing rural water district boards to adopt rules and regulations "as are deemed necessary for the conduct of the business of the district"). Yet, other sections grant express discretionary authority to the state rather than to the district. *See, e.g.*, *id.* § 82a-1022 (authorizing the chief engineer of Kansas's Division of Water Resources to "make any necessary modifications" to a proposed water district map "so that, in the opinion of the chief engineer, a manageable area will result").

Douglas-4 asks this court to view the question of necessity with the same level of deference given under Kansas law to decisions made by public utilities, for, as Douglas-4 points out, "[i]n law and in fact, a rural water district exercises the powers of a public utility." *Dedeke*, 623 P.2d at 1331. If the deference given to utilities broadly applied to all water-district actions, then presumably Douglas-4 could simply assert any reasonable excuse to justify taking out the private loan. C*f. Schuck v. Rural Tel. Serv. Co.*, 180 P.3d 571, 576-78 (Kan. 2008) (holding that utility company's exercise of eminent domain was "necessary to [its] lawful corporate purpose" where it unintentionally installed a cable outside of a pre-existing easement and then asserted after the fact that placing the cable along the

-15-

easement would have caused a service interruption).

However, the cases under which the Kansas Supreme Court has favorably compared a water district's powers to those of a public utility appear limited to the realm of eminent domain. Nor is it clear the reasoning underlying a favorable comparison between public utilities and water districts is even applicable to a case where a water district seeks some form of federal aid to protect it from market competition. For example, in *General Communications System, Inc. v. State Corp. Commission*, 532 P.2d 1341, 1348 (Kan. 1975), the Kansas Supreme Court held that, for the issuance of public utility certificates, "necessity does not necessarily mean there must be a showing of absolute need," but rather that "the word 'necessity' means a public need without which the public is inconvenienced to the extent of being handicapped." It is unclear how this use of the word "necessity" for a "public need" would apply by analogy to the exercise of powers reserved to water districts for at least the incidental benefit of protection from competition. Furthermore, we are reminded that under Kansas law, any reasonable doubt as to the existence of a water district's power must be resolved against its existence.

Douglas-4's decision to seek out a federal guarantee must therefore be justified by more than the incidental monopoly protections afforded by § 1926(b); the guarantee must further at least one of the District's purposes as a rural water service provider as provided in its charter, bylaws, or enacting statutes.

-16-

Protection from competition does not suffice. Nor can Douglas-4 justify its cooperation by appealing to the abstract goals of maintaining its corporate existence, profits, or integrity without some direct association to an enumerated purpose under its charter, bylaws, or relevant statutes.

This does not mean that Douglas-4's cooperation with the USDA must be "absolutely necessary," i.e., that it could not receive financing without the guarantee. Nor must Douglas-4 prove that a guarantee was the only or even the cheapest course of action available. Additionally, nothing within § 82a-619, or any other section governing water districts, prohibits a water district from benefitting from the protections of § 1926(b) so long as its triggering cooperation or acceptance of aid furthered a purpose of its organization.

To conclude, because the jury instructions incorrectly framed the necessity issue, we must reverse, vacate the judgment, and remand for a new trial for the limited purpose of determining whether Douglas-4's cooperation to secure the federal guarantee was necessary for the purposes of its organization.[7]

---

[7] It is appropriate for the trial court to limit retrial here only to the issue of necessity. "A principal advantage of using a special rather than a general verdict is that an error may only affect a few of the trial court's findings, thus limiting a new trial or vacatur of the judgment to the issues covered by the tainted findings." *United States v. Ofchinick*, 883 F.2d 1172, 1180 (3rd Cir. 1989); *see generally* David A. Lombardero, *Do Special Verdicts Improve The Structure of Jury Decision-Making?*, 36 Jurimetrics J. 275, 277-78 (1996) (observing that special verdicts facilitate appellate review and "may promote judicial economy by limiting the issues in a possible retrial").

**B. The district court's decisions and portions of the jury verdict pertaining to the "made services available" prong are affirmed**.

To receive the protections afforded by § 1926(b), Douglas-4 must also establish it "made services available" to the affected areas "prior to the time an allegedly encroaching association began providing service." *Sequoyah Cnty.*, 191 F.3d at 1202 (internal brackets and quotation marks omitted). "In order to determine whether a water association has made service available, the focus is primarily on whether the water association has *in fact* made service available, i.e., on whether the association has proximate and adequate 'pipes in the ground' with which it has served or can serve the disputed customers within a reasonable time." *Rural Water Dist. No. 1*, 243 F.3d at 1270 (internal quotation marks omitted). To meet this test, the water district must demonstrate that "it has adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made." *Id.*

The parties dispute several issues of law pertaining to the "made services available" prong, discussed below.

*1. The burden of proving unreasonable, excessive, and confiscatory costs rests with Eudora.*

The parties first disagree over whether Eudora must prove that Douglas-4's costs of services are unreasonable, excessive, and confiscatory, or whether Douglas-4 must prove the counterfactual.

Even where a rural water district meets the "pipes in the ground" test, "the cost of [its] services may be so excessive that it has not made those services 'available' under § 1926(b)." *Id.* at 1271. The water district's costs of service need not be competitive with the costs of services provided by other entities, including municipalities, but "the protection granted . . . by § 1926(b) should not be construed so broadly as to authorize the imposition of *any* level of costs." *Id.* Thus, costs may not be unreasonable, excessive, and confiscatory. *See id.* Although a determination of the reasonableness of costs is based on the totality of the circumstances, we have also identified four non-exclusive factors from Kansas law which help guide the factfinder in its determination: "(1) whether the challenged practice allows the district to yield more than a fair profit; (2) whether the practice establishes a rate that is disproportionate to the services rendered; (3) whether other, similarly situated districts do not follow the practice; (4) whether the practice establishes an arbitrary classification between various users." *Id.*

Eudora argues that Douglas-4 carries the burden of proving that its costs are *not* unreasonable, excessive, and confiscatory because the question of costs falls under the broader "made services available" prong, which the water district generally must establish. However, we have previously held that even if the water district meets the "pipes in the ground" test, then it is up to the defending city to show that the water district's rates are unreasonable, excessive, and confiscatory. *See id*. at 1272 ("[T]he City should be afforded an opportunity to

show that Post Rock's practice was excessive, unreasonable, and confiscatory. If the City makes such a showing, then the court should conclude that the water district has not provided or made service available.") (internal quotation marks and brackets omitted).  This distribution of burdens also aligns our case law with the decisions of the Kansas Supreme Court.  *See, e.g.*, *Shawnee Hills Mobile Homes, Inc. v. Rural Water Dist. No. 6*, 537 P.2d 210, 217 (Kan. 1975) (holding that water rates set by a municipal corporation such as a water district are generally presumed to be valid and reasonable until the contrary has been established by the challenging party).

> 2. *The district court properly informed the jury that the cost of fire protection is relevant to the issue of whether Douglas-4's costs of service are unreasonable, excessive and confiscatory.*

In its cross-appeal, Douglas-4 challenges the district court's jury instruction that the cost of fire protection services may be considered when determining the reasonableness of its cost of services.  Specifically, the court informed the jury in Instruction No. 20 that:

> Water service does not include water service for fire protection.  Thus, to provide or make service available, Douglas-4 is not required to provide or make water service available for fire protection.

> But, in determining whether Douglas-4's prices for water service were unreasonable, excessive, and confiscatory, you may consider the quality of water service that could be provided by Douglas-4, including whether and to what extent it could provide water for fire protection.

-20-

(Appellant's App. at 1652.)  Douglas-4 argues that because it is not required to provide fire protection any fees it charges to offer fire protection to its customers are irrelevant.

The District reads too much into this circuit's case law on fire protection. It is well established that a water district's ability to provide water for fire protection is not a factor the court should analyze when determining whether the district has made service available.  *See, e.g.*, *Rural Water Sewer*, 2011 WL 3000591 at *6 (reviewing the case law on fire protection and concluding that the "ability to provide fire protection is simply not relevant to the specific question of whether [a rural water district] has adequate pipes in the ground to 'make service available' for purposes of the § 1926(b) protection from competition"); *Sequoyah Cnty.*, 191 F.3d at 1204 n.10 ("[A] water association's *capacity* to provide fire protection is irrelevant to its entitlement to protection from competition under § 1926(b)") (emphasis added).  But in cases where a water district's fees are at issue and the fact-finder must—as we have previously held—analyze these costs under the totality of the circumstances, an inspection of the nature and cost of all services offered by the water district might very well include an inquiry into costs associated with fire protection.

Should a water district decide to provide fire-protection services, its pricing of such services could also bear on several of the factors outlined in *Rural Water*

*District No. 1*. A water district may charge excessive fees for fire protection where no competing provider exists, or it may charge higher fees for fire protection only to lowball its fees for residential water. Perhaps it charges a flat fee for all water service when only some of its customers receive fire protection, thus providing more benefits to some customers over others. The cost of fire protection within the district's broader pricing scheme could allow the district to yield more than a fair profit, establish a rate that is disproportionate to the services rendered, or establish an arbitrary classification between various users. We therefore find no legal error in the district court's conclusion that fire-protection services may be considered solely to determine whether Douglas-4's prices for water service were unreasonable, excessive, and confiscatory.

Of course, at no time does a water district's decision to provide or forgo fire-protection services affect its ability to establish that it has sufficient "pipes in the ground" to make service available, and it is up to the party challenging the water district's § 1926(b) protection to prove that the water district's costs are unreasonable, excessive, and confiscatory. Moreover, costs must be examined individually for each property. *See Rural Water Dist. No. 1.*, 243 F.3d at 1271. Thus, the relationship between fire-protection services and costs is highly context-specific.

Last, we note that Eudora cannot now debate whether Douglas-4's costs of services were in fact unreasonable, excessive, and confiscatory because it has waived its arguments on the sufficiency of the evidence.

*3. Douglas-4 lacks the authority under state law to provide service to the Church Property.*

Douglas-4 also challenges the district court's dismissal of its claim that Eudora curtailed Douglas-4's service to property owned by the First Southern Baptist Church of Eudora. At issue is whether Douglas-4 may legally serve water to properties outside its boundaries such that it could plausibly make service available and therefore claim protection under § 1926(b). We review the district court's dismissal of Douglas-4's claim de novo, *see Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009), reversing only if Douglas-4's complaint states a claim for relief that is plausible on its face, *see Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009). We do not, however, accept as true any of Douglas-4's legal conclusions. *See id.*

Eudora annexed the church property after the start of this litigation. At no time was the property within Douglas-4's geographic boundary. Douglas-4 then obtained leave to file a supplement to its first amended complaint, alleging § 1926(b) protection from the City's provision of water service to the church property. It claimed Eudora violated § 1926(b) by annexing the property and then offering incentives to the church to obtain water service from it rather than from

-23-

Douglas-4. On the City's motion to dismiss, the district court concluded that Kansas law did not authorize Douglas-4 to serve the church property. Viewing the Kansas statutory scheme in its entirety, the court determined that a water district only has the legal right to provide service within its boundaries. On appeal, Douglas-4 challenges the district court's construction of the relevant statutes.

As part of a court's determination that a water district made service available, it must necessarily evaluate whether the water district possesses the legal authority to make service available. *See Sequoyah Cnty.*, 191 F.3d at 1201 n.8 ("Without a right to provide service arising from state law, a water association would be unable to assert its entitlement to protection."). Kansas law does not expressly permit or prohibit a rural water district from serving customers outside of its boundaries. *See* K.S.A. § 82a-619. However, a review of the statutes concerning rural water districts reveals a clear association between a water district's geographic boundaries and those laws pertaining to its corporate governance, facilities, and operations. For example, a petition to create a rural water district must be signed by property owners within the district's proposed boundaries and state that lands within the boundaries lack an adequate water supply. *See id.* § 82a-614. A water district possesses the express power of eminent domain only within its boundaries. *See id.* § 82a-619(a). It may employ labor "necessary to the proper performance of such work or improvement as is

-24-

proposed to be done *within any such district.*" *Id.* § 82a-620 (emphasis added).

To attach lands outside the district, the new landowners must follow procedures similar to those in § 82a-614: a petition must be signed by owners of the land within the newly proposed area stating that such lands are without adequate water supply, *see id.* § 82a-622, and upon the county's approval, those landowners are entitled to subscribe to the water district's benefit units, *see id.* § 82a-624.

There is no indication within the statutory scheme of any authority that suggests water districts may serve customers outside their boundaries. C*f. id.* § 82a-621 (permitting "[o]wners of land located *within the district* who are not participating members" to subscribe to benefit units) (emphasis added); *id.* § 82a-619(f) (authorizing the power to contract with cities or counties to treat wastewater "within the boundaries of the district"); *id.* § 82a-625 (authorizing the power to construct new works "within such district"). Although § 82a-619 does provide water districts with the general power to "contract" and to "construct, install, maintain and operate" facilities "necessary to carry out the purposes of its organization," the statutory scheme leaves more than a reasonable doubt as to the existence of the power to provide water service outside of a district's boundaries. We thus affirm the court's dismissal of Douglas-4's claim on the church property.

**C. The district court's decisions and portions of the jury verdict pertaining to curtailment or limitation of Douglas-4's water service are affirmed.**

-25-

We next review the legal grounds upon which the district court based its conclusion that Eudora curtailed or limited Douglas-4's water service. Without the City's sufficiency-of-the-evidence arguments, we are left with two legal issues to resolve: first, whether a city's annexation of a protected area can, standing alone, violate § 1926(b); and second, whether a city's threats or solicitations regarding water service may, in the alternative, serve as the violative act.

7 U.S.C. § 1926(b) prevents a municipality from curtailing or limiting water service "by inclusion of the area served by [a protected] association within the boundaries of any municipal corporation or other public body." Although it annexed the affected area, Eudora never actually provided water service to any of Douglas-4's customers or prospective customers. There are instead two possible bases for Douglas-4's 1926(b) claim: Eudora's annexation of the affected areas, and Eudora's alleged threats to Douglas-4 and Douglas-4's customers that it might elect to de-annex the affected areas or condemn Douglas-4's assets. Eudora argues that neither annexation nor threats to de-annex or appraise Douglas-4's assets may be treated as actual curtailments or limitations under § 1926, while Douglas-4 asserts that both acts violate the statute. We address each in turn.

*1. Annexation alone does not necessarily curtail water service.*

As a matter of federal law, annexation alone does not cause curtailment; rather, there must be some further action that limits the protected water district's ability to serve its customers. *See Glenpool*, 861 F.2d at 1214 ("[A city] may not legally use inclusion of [an area] within the boundaries of any municipal corporation *as a springboard* for providing water service to the area, and thereby limit the service made available by [a protected water district].") (emphasis added) (internal quotation marks omitted). A city may annex land within a water district's boundaries so long as it does not use the annexation as a means to provide water service or limit the water district's services to the annexed area.

Similarly, as a matter of Kansas law, an annexing municipality is not compelled to engage in some post-annexation conduct that would necessarily curtail or limit a water district's ability to serve the annexed area. K.S.A. §§ 12-540 and 541(a), enacted by the Kansas legislature in 2010, describe the process by which a city may, if it chooses, designate itself or some other water supplier for the recently annexed area.[8] "Following annexation, the rural water district

_____

[8] K.S.A. § 12-527, the statute cited in Douglas-4's briefs, stated: "[w]henever a city annexes land located within a rural water district . . . the city *shall* negotiate with the district" to acquire title to the district's assets within the annexed area. However, it was repealed in March 2010 and replaced by K.S.A. § 12-540 *et. seq. See* 2010 Kan. Sess. Laws Ch. 15, House Bill No. 2283 (March 24, 2010). We thus apply the law in existence at the time of this appeal. *See State ex rel. Stephan v. Bd. of Cnty. Comm'rs of Lyon Cnty.*, 676 P.2d 134, 139 (Kan. 1984) ("When called upon to consider legislative enactments which follow trial court rulings, this court has not hesitated.").

Yet, we also conclude that the enactment of K.S.A. § 12-540 *et seq.* "d[id]
(continued...)

shall remain the water service provider to the annexed area unless the city gives written notice designating a different supplier." K.S.A. § 12-541(a). Or, "[f]ollowing annexation . . . , the city and the [water] district may contract for the district to provide water service to all or certain portions of the annexed area." *Id.* § 12-540. Nor is the city required to impose a franchise, license, or permit should the water district retain its water service over an annexed area. *Id.* ("If the agreement includes a provision for the payment of a franchise fee to the city, such agreement shall be subject to the provisions of K.S.A. § 12-2001 *et seq.*"). Because §§ 12-540 and 541(a) do not obligate Eudora to violate § 1926(b), annexation alone cannot serve as the sole ground for Douglas-4's claim against Eudora.

> 2. *A competing municipality may, however, curtail services through threats if the threats effectively limit the water district's ability to serve existing customers or acquire potential customers to whom it would otherwise provide service.*

---

[8](...continued)

nothing more than clarify the ambiguities in the statute rather than [] change the law." *Trees Oil Co. v. State Corp. Comm'n*, 105 P.3d 1269, 1285 (Kan. 2005). Even § 12-527's directive that the city "shall negotiate with the district" to acquire title would not necessarily compel the City to acquire Douglas-4's assets. In Kansas, statutory provisions directing these types of proceedings "are not regarded as mandatory[] unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated." *Paul v. City of Manhattan*, 511 P.2d 244, 249 (Kan. 1973). Similarly, "failure to comply with the requirements of [a mandatory statute] either invalidates purported transactions or subjects the noncomplier to affirmative legal liabilities." *Wilcox v. Billings*, 438 P.2d 108, 111 (Kan. 1968). Section 12-527 contained neither proviso. Thus, if we apply K.S.A. § 12-527 rather than § 12-540 *et seq.*, we reach the same conclusion.

We must also determine whether a city's threat to either de-annex a protected area or force an appraisal process violates 7 U.S.C. § 1926(b) by dissuading potential customers from seeking water service from the protected water district. The district court concluded that threats could limit Douglas-4's ability to provide water service if the threats deterred existing or potential customers from using the water district's services. On appeal, Eudora argues that such actions do not rise to the level of "competition" contemplated by § 1926(b).

We must first apply the general principle that "§ 1926(b) indicates a congressional mandate that local governments not encroach upon the services provided by [federally indebted water] associations, be that encroachment in the form of competing franchises, new or additional permit requirements, or similar means." *Pittsburg Cnty.*, 358 F.3d at 715 (emphasis omitted). We therefore construe § 1926(b) liberally to protect water districts from the various forms of municipal encroachment. *See id*. Indeed, the type of encroachment contemplated by § 1926(b) is not limited to the traditional guise of an annexation followed by the city's initiation of water service. It also encompasses other forms of direct action that effectively reduce a water district's customer pool within its protected area. *See id.* at 716 ("[T]he question becomes whether McAlester's sales to customers . . . purport to take away from Pitt 7's § 1926 protected sales territory.").

If a city informs a water district's customer that it will de-annex his property unless he requests water from the city and not the water district, the customer is effectively forced to make a choice: either cease water service from the water district or find a new provider for all other public services. Under these circumstances, the city's conduct creates a wedge between the water district and its customer anethmatic to the protections intended by Congress. The property owner's dependence on the city for virtually all non-water services, from road and sewer maintenance to police and fire security, puts him—and by association the servicing water district—in a vulnerable position. It very well may prevent the water district from further developing and maintaining its customer base.

However, a city may instead act in a manner that does not curtail or limit water services provided or made available by a protected district. This might occur where, after annexation, a city allows the water district to continue as before. Or it may initiate negotiations with the district for purchase of the district's assets. When a city first notifies a water district of its intent, there is nothing impeding a customer from obtaining—or the water district from providing—water services. Under Kansas law, for instance, the parties still must agree on the assets' value. If they cannot agree, then no change in water service provider shall occur until at least 120 days pass and the parties complete mandatory mediation. *See* K.S.A. § 12-541(a). If mediation is unsuccessful, only then is a third-party appraiser appointed. Throughout this entire period, the water

district may continue to provide or make available water service, and ultimately the city may decide to either assert or waive its appraisal rights as the situation develops. Of course, a city's assertion of appraisal rights may give rise to an actual curtailment or limitation, but this occurs only when there is evidence that the city's assertions impeded the water district's ability to provide or make service available or deterred customers from obtaining the water district's services.

Eudora's remaining arguments that target whether its communications to Douglas-4 and Mr. Garber actually curtailed or limited Douglas-4's ability to provide or make service available to any of the affected properties challenge the sufficiency of the evidence and are waived.

*3. The district court properly admitted Douglas-4's threat-based evidence.*

Eudora also objects to the admissibility of so-called "threat" evidence based on a lack of relevance under Rule 401 and its potential for prejudice under Rule 403. Specifically, it challenges the admission of various letters from Eudora's attorney to Mr. Garber's attorney and Douglas-4's attorney regarding Eudora's intent to appraise Douglas-4's property, and statements by Eudora's attorney to Mr. Garber contemplating de-annexation of Mr. Garber's development should Eudora be unable to provide water service. Yet, evidence that Eudora sought to influence, deter, or impede potential customers within Douglas-4's protected service area goes to the very heart of Douglas-4's theory of the case,

-31-

and any such communication will make more or less probable that Eudora effectively curtailed or limited Douglas-4's ability to serve or make available its water service.  The district court did not abuse its discretion by admitting such evidence.

Eudora also claims that letters between its attorney and Douglas-4's attorney were settlement negotiations and therefore should have been excluded under Rule 408.  Upon reviewing the letters, the district court did not find evidence of "discussions between these two parties trying [to] work this out, trying to settle it, [or] trying to compromise," (Appellant's App. at 1805), but rather found evidence suggesting Eudora had staked out its position that it would ultimately enforce its appraisal rights without Douglas-4's immediate capitulation.  For example, in his letter of September 18, 2007, counsel for Eudora informed counsel for Douglas-4 that Eudora planned to file suit against Douglas-4 if it did not begin complying with Kansas's appraisal law by October 1.  And in his letter of September 21, 2007, counsel for Eudora informed Douglas-4 it would immediately file suit if Douglas-4 took "any further action to expand its service into City limits" prior to October 1.  (Appellant's Add. at 52.)  By contrast, the district court did exclude portions of an earlier 2006 letter, (*id.* at 189-90), which contained elements of "a classic settlement offer," (Appellant's App. at 2675).  We see no abuse of discretion in the district court's decision to

distinguish between letters containing clear settlement offers and letters containing near-term demands for immediate compliance alongside promises of a possible lawsuit.

> *4. Eudora may not challenge the sufficiency of the evidence pertaining to its curtailment of the other properties.*

The City's challenge to the jury verdict as it pertains to the non-Garber properties is waived for failure to file a Rule 50(b) motion.

**D. Douglas-4's remaining claims on cross-appeal are not subject to review.**

Finally, Douglas-4's remaining challenges in its cross-appeal have no bearing on the ultimate outcome of this case and are therefore unavailable for review. *See, e.g.*, *Affiliated Ute Citizens v. Ute Indian Tribe*, 22 F.3d 254, 255 (10th Cir. 1994) ("A prevailing party may not appeal and obtain a review of the merits of findings it deems erroneous which are not necessary to support the [district court's] decree.").

## CONCLUSION

The district court's judgment is REVERSED and the trial verdict VACATED. The matter is REMANDED for further proceedings solely on the issue of whether Douglas-4's cooperation to secure a Rural Development guarantee was necessary to carry out the purposes of its organization. All other issues on appeal and cross-appeal are AFFIRMED. Both parties' motions to strike portions of each other's reply briefs are DENIED.