**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**October 21, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

GARRETT DEVELOPMENT, LLC, an
Oklahoma limited liability company,

     Plaintiff - Appellee,

v.

DEER CREEK WATER
CORPORATION, an Oklahoma not for
profit corporation,

     Defendant - Appellant.

No. 21-6105
(D.C. No. 5:18-CV-00298-D)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

This case involves a dispute over the conditions imposed by a rural water

association, Deer Creek Water Corporation ("Deer Creek"), on a private developer,

Garrett Development, LLC ("Garrett"). Congress has protected rural water

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and
Tenth Circuit Rule 32.1.

associations indebted to the Department of Agriculture ("USDA")[1] from encroachments on their service areas by municipalities, so long as the water association makes services available to customers within the service area. 7 U.S.C. § 1926(b). Garrett owns property within Deer Creek's service area, but it filed this lawsuit seeking a declaration that Deer Creek's service area was not protected by 7 U.S.C. § 1926(b) because Deer Creek has imposed such onerous conditions on the provision of water service that service is effectively unavailable.

After a three-day bench trial, the district court concluded Deer Creek's conditions for service to Garrett were unreasonable, excessive, and confiscatory. The district court therefore granted judgment in favor of Garrett and declared that Garrett may obtain water from any provider, including the municipality of Oklahoma City, Oklahoma. Deer Creek filed a timely appeal. For the reasons stated below, we affirm.

## I.    BACKGROUND

To provide context for the factual and procedural history of this dispute, we begin with an overview of 7 U.S.C. § 1926(b). With the benefit of that background,

---

[1] Prior to 1994, the loans relevant to 7 U.S.C. § 1926(b) were operated by the Farmers Home Administration (FmHA). *See Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 701 n.1 (10th Cir. 2004). The USDA now operates the loan and guarantee program through the Rural Utility Services. *Id.*; United States Dept. of Agriculture, Rural Development Water & Waste Disposal Loan & Grant Program, https://www.rd.usda.gov/programs-services/water-environmental-programs/water-waste-disposal-loan-grant-program (last visited October 12, 2022). For the sake of consistency, we refer to the creditor entity of Deer Creek's loans as the USDA throughout this order.

we set forth the factual and procedural history of this dispute. Then, we proceed to the analysis of the issues before us on appeal.

### A.    Statutory and Legal Background

In passing the Agricultural Act of 1961, Pub. L. No. 87–128, 75 Stat. 294, Congress sought to preserve and to protect rural farm life. Title III of the Act—the Consolidated Farm and Rural Development Act—is concerned largely with issues of agricultural credit. Codified at 7 U.S.C. §§ 1921–2009cc-18, "the Consolidated Farm and Rural Development Act, . . . authorize[s] the Secretary of Agriculture to make or insure loans to nonprofit water service associations for 'the conservation, development, use, and control of water.'" *Sequoyah Cnty. Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1194 (10th Cir. 1999) (quoting 7 U.S.C. § 1926(a)). Section 1926 of the Act applies to "associations, including corporations not operated for profit . . . and public and quasi-public agencies to provide for the . . . control of water . . . primarily serving farmers, ranchers, farm tenants, farm laborers, rural business, and other rural residents." 7 U.S.C. § 1926(a). For the recipients of these federal loans, § 1926(b) protects associations meeting this definition from competition by way of municipal encroachment:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

3

7 U.S.C. § 1926(b).

By enacting this section, "Congress intended to protect rural water [associations] from competition to encourage rural water development and to provide greater security for and thereby increase the likelihood of repayment of [USDA] loans." *Rural Water Dist. No. 1, Ellsworth Cnty v. City of Wilson*, 243 F.3d 1263, 1269 (10th Cir. 2001) (citing *Bell Arthur Water Corp. v. Greenville Utils. Comm'n*, 173 F.3d 517, 523 (4th Cir. 1999)). Consistent with the purpose of this section, we have "broadly" construed § 1926(b) "to protect rural water [associations] from competition with other water service providers." *Id.* (citing *Adams County Reg. Water Dist. v. Vill. of Manchester*, 226 F.3d 513, 518 (6th Cir. 2000); *Bell Arthur*, 173 F.3d at 520, 526; *Lexington–South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 235 (6th Cir. 1996)). This construction furthers "'a congressional mandate that local governments not encroach upon the services provided by [federally indebted water] associations, be that encroachment in the form of competing franchises, new or additional permit requirements, or similar means.'" *Id.* (quoting *City of Madison, Miss. v. Bear Creek Water Ass'n, Inc.*, 816 F.2d 1057, 1059 (5th Cir. 1987)).

To receive the protection provided by § 1926(b), rural water associations have the burden to establish two requirements. *Rural Water Dist. No. 4, Douglas Cnty. v. City of Eudora*, 659 F.3d 969, 976, 980 (10th Cir. 2011). The association must "(1) have a continuing indebtedness to the [USDA] and (2) have provided or made available service to the disputed area." *Ellsworth*, 243 F.3d at 1269. To satisfy the

4

second prong, "the focus is primarily on whether the water association has in fact made service available, i.e., on whether the association has proximate and adequate 'pipes in the ground' with which it has served or can serve the disputed customers within a reasonable time." *Id.* at 1270 (internal quotation marks and emphasis omitted). To meet this test, the rural water association must demonstrate that "it has adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made." *Id.*

However, even where a rural water association meets the "pipes in the ground" test, "the cost of [its] services may be so excessive that it has not made those services 'available' under § 1926(b)." *Id.* at 1271. The reasonableness of a water association's costs for service is based on the totality of the circumstances, and we have identified four non-exclusive factors to guide this determination. *Id.* (citing *Shawnee Hills Mobile Homes, Inc. v. Rural Water Dist. No. 6*, 537 P.2d 210, 217 (Kan. 1975)). These four *Ellsworth* factors consider:

> (1) whether the challenged practice allows the [association] to yield more than a fair profit; (2) whether the practice establishes a rate that is disproportionate to the services rendered; (3) whether other, similarly situated [associations] do not follow the practice; (4) whether the practice establishes an arbitrary classification between various users.

*Id.* The burden to show unavailability of water service based on the cost of service is on the party challenging the protected service area. *Douglas*, 659 F.3d at 981. With this statutory framework in mind, we turn to the facts of this case.

### B.    *Factual History*

Deer Creek is a private, non-profit rural water corporation formed pursuant to title 18, section 863 of the Oklahoma Code and governed by the Oklahoma General Corporation Act. It provides rural water service to unincorporated areas of Oklahoma County north of Oklahoma City and serves approximately 2,500 customers. Deer Creek has obtained loans from and remains indebted to the USDA. Despite the interest payments on these federal loans and other expenses, Deer Creek made an average profit of about $500,000 in 2016 and 2017. Pursuant to 7 U.S.C. § 1926(b), Deer Creek claims exclusivity over its service area, which includes land owned by Garrett in Oklahoma County.

Garrett's land is positioned just outside of the northern border of Oklahoma City's municipal limits, and Deer Creek provides water to the parcels surrounding Garrett's property to the north, west, and east. Deer Creek has also maintained an eight-inch water main on the northern part of Garrett's land since 1972. Garrett plans to build a 510-unit single-family home development (the "Proposed Development") on this land.

When Garrett originally purchased the property, it was zoned for agricultural and rural residential use. With this zoning, residential density is limited to one home for every two acres, or around a total of eighty homes. In April 2014, Garrett filed an application with the Board of County Commissioners of Oklahoma County to rezone for "urban single family" density, a change that would have allowed Garrett to build the desired 510-home development. The Board denied Garrett's rezoning application

6

because water and sanitary sewer facilities were not available to the Proposed

Development at the higher residential density. The Oklahoma state court later upheld

the denial.[2]

Garrett first applied to Deer Creek for water service to the Proposed

Development in April 2014. Deer Creek accepted the application, subject to

significant conditions. Because Garrett did not satisfy Deer Creek's conditions for

service by the stated deadline, Deer Creek's conditional acceptance expired. *See* App.

Vol. I at 100 (noting the conditional acceptance expired "on or about November 15,

2015").

Thereafter, Garrett applied to have the property annexed into the city limits of

Oklahoma City so the municipality could provide water to the Proposed

Development. The Oklahoma City Planning Department voted to support annexation

on the condition that Garrett obtain a "full release from the Deer Creek Rural Water

[Corporation]." App. Vol. II at 490. Deer Creek refused to release Garrett's property

from its service area and the annexation effort was unsuccessful.

After the petition for annexation failed, Garrett reapplied to Deer Creek for

water service to the Proposed Development. In February of 2018, Deer Creek again

conditionally accepted Garrett's application on nearly identical conditions to those

offered in 2015. Those conditions focused on four obligations: (1) well construction,

---

[2] After the district court entered judgment in Garret's favor, in January 2022, the city counsel of Oklahoma City annexed Garrett's property into the city limits and rezoned the property for residential use. With this zoning, Garrett states it "is authorized to develop up to 925 lots" on the property.

(2) transfer of water and property rights, (3) additional infrastructure, and (4) payment of fees. We provide the details of those requirements now.

## 1.    Well Construction Conditions

Deer Creek conditioned service on Garrett providing "four successful water wells of sufficient quantity and acceptable quality within the development." App. Vol. XI at 2714. Deer Creek required Garrett to "pay for all costs relating to the water well development including but not limited to test holes, [and] test wells," *id.*, as well as an "inspection fee equal to 4% of all water system construction costs and well costs." *Id.* Upon completion, "Deer Creek Water Corporation [was to] maintain full control over well design, location, testing procedures, construction and [the] well development process." *Id.*

## 2.    Transfer of Water and Property Interests Conditions

Deer Creek also required Garrett to "dedicate the water rights beneath the [P]roposed [D]evelopment" to Deer Creek "and provide four well sites," the location of which was to be determined by Deer Creek. *Id.* If the water rights on the property were "previously sold, transferred or severed from [the] property," Garrett had to "purchas[e] an equal amount of water rights as deemed by [Deer Creek] to be usable by [Deer Creek] and to transfer the[] water rights to [Deer Creek] at no cost to" the water association. *Id.* at 2721. Deer Creek also mandated that Garrett provide it with a fifty-foot by fifty-foot "permanent water well easement per well site with related utility access easements as determined by" Deer Creek. *Id.*

### 3. Additional Infrastructure Conditions

Deer Creek next insisted that Garrett construct two twelve-inch water mains; pay for three-phase power; and furnish and install water meter cans, setters, curb stops and service lines. And, with respect to this required infrastructure, Deer Creek required Garrett to furnish two bonds: (1) a maintenance bond and (2) a statutory bond. The maintenance bond had to "be for a period of two (2) years" and "in an amount equal to one hundred percent (100%) of the contract amount." *Id.* at 2719. The statutory bond was to "provide that the [c]ontractor will make payment for all labor, materials and equipment used in the construction of the project." *Id.* Deer Creek also conditioned service on Garrett paying an inspection fee equal to 4% of the water system construction cost.

### 4. Additional Fee Conditions

Deer Creek demanded the payment of two fees before it would provide water service to the Proposed Development: an impact fee and a membership fee. Every member of Deer Creek must pay an impact fee, which is calculated at $2,500 per residence or unit for both single residence users and developers. Under this formula, the aggregate impact fee for Garrett's 510-home Proposed Development is $1,275,000. Because the provision of water wells is a condition of service, however, Deer Creek offsets the amount of the impact fees against the cost of water well development. Specifically, Deer Creek's policy states, "the Impact Fees paid by [Garrett] shall be applied to the cost of said wells." App. Vol. XI at 2722.

9

Deer Creek also conditions water service on Garrett paying a membership fee. The fee for both residential and development users is $1,500 for each 5/8-inch residential meter and $2,500 for each 1-inch residential meter. The membership fee "represents an ownership interest in the water system." App. Vol. IX at 2300; *see also id.* at 2360. It also includes "the cost of the meter." *Id.* at 2359. The meters must be installed by Deer Creek and cost anywhere from $150 to $300 each.

As a result of these conditions, Deer Creek is obligated to provide and install only the meters with respect to the initial costs of bringing water services to the Proposed Development. After initial installation, however, Deer Creek will be responsible for maintenance and repair of the system throughout its life.

### C.   *Procedural History*

### 1.   **Pretrial Proceedings**

Rather than attempting to comply with Deer Creek's conditions, Garrett initiated this lawsuit. Garrett's Complaint contained two claims challenging Deer Creek's assertion of exclusivity over the service area protected by 7 U.S.C. § 1926(b). First, Garrett asked the district court to declare that Deer Creek may not claim exclusivity protected by § 1926(b) because the state of Oklahoma has authorized only rural water districts "to borrow money under the terms of the Consolidated Farm and Rural Development Act" ("Declaration re Exclusivity"). App. Vol. I at 16. Claiming that Deer Creek is not a rural water district, Garrett asked the district court to declare it has no "service area capable of protection" under § 1926(b). *Id.*

10

Second, Garrett asked the district court to declare Deer Creek's service area not protected by § 1926(b) because Deer Creek's conditions are so onerous as to make water service through Deer Creek unavailable to Garrett ("Declaration re Availability"). For both claims, Garrett sought a declaration that it is "free to obtain water services from a water service provider other than Deer Creek, including without limitation the City of Oklahoma City." *Id.*

Deer Creek filed a motion to dismiss Garrett's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). Deer Creek made three arguments challenging the district court's subject matter jurisdiction. First, Deer Creek argued Garrett lacks standing to seek the Declaration re Exclusivity because any declaration of rights under § 1926(b) would determine only the rights of a non-party water service provider to provide water services to Garrett, not Garret's right to receive such services. Second, Deer Creek maintained that Garrett's claim seeking the Declaration re Availability was not ripe because its land had not been rezoned for residential use as required to build the Proposed Development. Third, Deer Creek contended that any judgment would be an impermissible advisory opinion because Garrett's claims affect only the rights of a non-party water service provider, Oklahoma City.

The district court denied Deer Creek's Motion to Dismiss. It concluded Garrett was seeking a declaration of its own rights to obtain water. Although Deer Creek did not directly challenge any element of Garrett's constitutional standing, the district court further concluded Garrett adequately pleaded each standing requirement. The district court also determined that Garrett's claim seeking the Declaration re

11

Availability was ripe because the evidence indicated a property developer customarily obtains a commitment for water service prior to and in support of rezoning. The district court further ruled that any declaration from the court would not be an advisory opinion because it would directly affect Garrett's ability to obtain water.

After discovery, Deer Creek and Garrett filed cross-motions for summary judgment. Garrett argued it was entitled to summary judgment as to both of its claims for declaratory judgment. As to the Declaration re Exclusivity, Garrett argued that § 1926(b) violated the Tenth Amendment because Deer Creek is not organized as a rural water district under Oklahoma law and therefore Oklahoma did not accept the benefit of exclusivity for entities like Deer Creek. Garrett further argued Deer Creek is not an association protected by § 1926(b). Deer Creek disagreed, arguing it was entitled to summary judgment as to Garrett's claim for a Declaration re Exclusivity because, as an association within the definition of § 1926(a), Deer Creek is an entity entitled to protection under § 1926(b).

With respect to Garrett's claim for a Declaration re Availability, both parties asserted they were entitled to summary judgment. Garrett argued Deer Creek had failed to make services available in two ways. First, Garrett argued Deer Creek's current infrastructure was not capable of providing water services to the area. Second, Garrett argued the conditions for providing service were unreasonable, excessive, and confiscatory. Deer Creek again disagreed, claiming first that it had pipes in the ground and could serve the Proposed Development within six months.

12

Deer Creek next argued its conditions for water service were not so unreasonable, excessive, or confiscatory as to deprive Garrett of water service. Finally, Deer Creek renewed the arguments challenging the district court's subject matter jurisdiction it had previously made in the Motion to Dismiss pursuant to Rule 12(b)(1).

The district court granted in part and denied in part each motion for summary judgment. The court granted Deer Creek summary judgment as to Garrett's claim for a Declaration re Exclusivity, concluding "the plain language of § 1926(a) indicates Deer Creek is an entity that may be protected" under § 1926(b). App. Vol. VI at 1581. And the district court held that § 1926(b) did not violate the Tenth Amendment. As to the claim for a Declaration re Availability, the district court noted that both parties conceded Deer Creek is indebted to the USDA. Further, although the district court concluded Deer Creek's existing infrastructure did not have the capacity to serve the Proposed Development, it noted Garrett had not disputed that Deer Creek could make services available within a reasonable time. The district court concluded, however, that a genuine dispute of material fact existed as to whether Deer Creek's proposed conditions were so excessive, unreasonable, and confiscatory as to make services unavailable to Garrett. It therefore denied each party summary judgment on this narrow issue.[3]

---

[3] The district court did not analyze Deer Creek's arguments as to standing and justiciability because it concluded "nothing has significantly changed since the [c]ourt's previous Order." App. Vol. VI at 1581.

**2.      Bench Trial**

The district court held a three-day bench trial in June 2021. The only issue at trial was whether the cost of Deer Creek's conditions for water were so excessive, unreasonable, and confiscatory as to deny services to Garrett. At trial, William Patrick Garrett, manager of Garrett, and Timothy Johnson, a civil engineer, testified for Garrett. Debra Wells-Bethel, the manager of Deer Creek; William Myers, an engineer; and Larry Blaire, a water system member, testified for Deer Creek. In the following sections of this decision, we outline the relevant testimony as to (a) the infrastructure required to meet Deer Creek's conditions, (b) the cost of meeting Deer Creek's conditions, and (c) the conditions of similarly situated water providers. We then discuss the district court's rulings based on this evidence.

*a.      Required infrastructure testimony*

To determine the number of wells required to provide service to the Proposed Development, Deer Creek's expert witness, Mr. Myers, performed a hydraulic analysis. This analysis used model wells to estimate the pressure changes that would occur at each juncture of the Deer Creek water system if it began servicing the Proposed Development. Mr. Myers ran a series of models, adding additional wells individually until the systemwide average water pressure reached a level not less than 0.5 pounds per square inch ("psi") of the water pressure enjoyed prior to adding the Proposed Development.

To maintain that desired water pressure systemwide while servicing the Proposed Development, Mr. Myers determined Deer Creek would need four

additional wells. According to Mr. Myers, at peak usage, the Proposed Development would require 3.83 wells, and if Deer Creek's average annual use is considered, the Proposed Development would need only 3.49 wells. By adding four new wells to the system, Mr. Myers estimated the average pressure of the system overall would increase by 0.29 psi, an increase he described as "infinitesimal." App. Vol. X at 2554.

b.    *Cost testimony*

Mr. Garrett testified that the estimated cost to build the four wells and satisfy Deer Creek's other conditions for water service would be $4,128,793. Mr. Myers disagreed and estimated the cost to satisfy Deer Creek's conditions as approximately $1,850,000. The witnesses provided further testimony supporting these estimates.

To estimate the cost of drilling four successful wells, both parties used the average cost of $400,000 to dig each well, resulting in an estimated total cost of $1,600,000 for the four wells. Mr. Garrett, however, also included an additional $400,000 as a contingency in the event one well did not provide sufficient quantity or quality of water. With the addition of this contingency amount, Mr. Garrett estimated the total cost to build the water wells as approximately $2,000,000. Mr. Myers disputed the addition of $400,000, testifying that the contingency is already built into the $400,000 estimate per well. For the required three-phase electrical power, Mr. Garrett added $50,000 to the cost of the wells. In contrast, Mr. Myers excluded this expense entirely because the three-phase power will "be[] intrinsic to the power that would be [run] into the subdivision." App. Vol. X at 2627. Mr. Myers did not

15

dispute, however, that $50,000 was a reasonable estimate of the cost of three-phase power, if separately counted.

Mr. Garrett also included a value of $300 an acre for water rights based on the amount Deer Creek had paid to landowners in a prior transaction. *See* App. Vol. VIII at 2058; *see id.* at 2059–60 (relying on the amount Deer Creek paid "landowners in Horseshoe Acres"). He estimated the total cost of transferring water rights would be around $46,000 for the 155 acres comprising the Proposed Development. Ms. Wells-Bethel disputed the inclusion of such costs, testifying that Deer Creek had paid for water rights on only three occasions and would not pay for them here.

With respect to the cost of surface rights, Mr. Garrett used the amount of $3,400 per well site easement based on one transaction where Deer Creek paid landowners for surface rights. Because Deer Creek requires four well sites on the Proposed Development, Mr. Garrett estimated the total cost of surface rights at $13,600. Mr. Myers did not include any amount for water and surface rights in the overall cost of conditions because he testified that transferring these rights is typically at no cost to the water service provider.

The parties each estimated the cost of the water main extensions. Mr. Garrett testified the cost of building the twelve-inch water main extensions would be around $100 per foot, or $370,000 based on a total of 3,700 feet of main required to satisfy Deer Creek's conditions. Mr. Myers disagreed with the per foot estimate, testifying the cost is $53.91 per foot for the main extension, for a total of $200,006.

The parties also presented conflicting evidence on the costs of the inspection fee and maintenance bond. Because the inspection fee covered any infrastructure installed, Mr. Garrett estimated 5% of the cost of the wells, the twelve-inch mains, and the interior mains for a total of $233,423. For the cost of the two-year maintenance bond, Mr. Garrett estimated $140,054 based on 3% of the total water system. In turn, Mr. Myers calculated the total inspection fee as $99,938, explaining that the inspection fee would not include the wells and would be charged at a 4% rather than a 5% rate. Mr. Myers estimated the maintenance bond would cost only $74,953, based on the water mains and interior infrastructure.

Ms. Wells-Bethel explained that after the two-year maintenance bond expires, Deer Creek will be responsible for all maintenance for the Proposed Development's water system in perpetuity. She testified that this maintenance would include "redrilling [the wells] on an average" of every twenty years. App. Vol. IX at 2404. Ms. Wells-Bethel indicated the subdivision would be the largest development in Deer Creek's service area and that "[m]aintenance in a subdivision is much, much more expensive than any maintenance we do in a rural area" because this maintenance involves "repairing lines under driveways and sidewalks." *Id.* at 2374.

Mr. Garrett next testified that the cost of the impact fees at $2,500 per unit would equal $1,275,000. He further explained that although Deer Creek's subdivision policy provided the impact fee would be credited back against the cost of the water wells, he included it because the policy does not detail when that would happen.

17

Because Deer Creek credits the fee back to Garrett, neither Mr. Garrett nor Mr. Myers included the cost of impact fees in their estimates.

The parties also discussed Deer Creek's membership fees. Mr. Garrett estimated $1,275,000 in membership fees based on $2,500 per lot for 1-inch meters. Mr. Garrett explained he used the cost for the 1-inch meters in his estimate rather than the 5/8-inch meters because "these are upscale homes" and "[t]hat[] is what [Garrett] prefer[s]." App. Vol. VIII at 2052. Mr. Garrett included a membership fee for all 510 lots because if Garrett also acts as the builder of the homes, it will need to pay the fee "before [it] can get water turned on [to] finish the masonry work or the plumbing." *Id.* at 2218. Mr. Garrett concluded the membership fee covered nothing more than the cost of each meter, which was around $200, and therefore Deer Creek is "making a million dollars just on the membership fees." *Id.* at 2069; *see also id.* at 2218 (Mr. Johnson testifying "we felt there is no benefit to a membership fee except you get a meter").

To the contrary, Ms. Wells-Bethel claimed the membership fee covers more than just the meter for each unit. She explained the membership fee also represents an ownership interest in Deer Creek. And Ms. Wells-Bethel noted that, as the developer, Garrett is required to pay for only one membership fee of $1,500. This is because the membership fee for each individual lot need not be paid until the customer needs a meter and water service to that specific lot. Ms. Wells-Bethel also disagreed that the Proposed Development would need 1-inch meters, or that the

18

developer would get to choose the size of the meters for each unit. Accordingly, Mr. Myers included the cost of a single membership—$1,500—in his estimate.

Relying on figures from 2017, Mr. Garrett calculated that Deer Creek currently makes "about $189 per user" in profit each year. App. Vol. VIII at 2059. With 510 new users planned in the Proposed Development, Mr. Garrett estimated Deer Creek would "make approximately $96,000 [annually] off these new users [in] profit" based on water sales. *Id.* Ms. Wells-Bethel disagreed that Deer Creek would make a profit proportional to the 2017 data from the new 510-users because of the higher maintenance costs in a subdivision. App. Vol. IX at 2374. She also testified that in the year of 2020, Deer Creek experienced "a loss of over $130,000." *Id.* at 2381.

c.     *Similarly situated testimony*

Garrett's expert, Timothy Johnson, compared seven water providers to Deer Creek that he chose due to their "proximity to [the] [P]roposed [D]evelopment as well as the size and type of water districts." *Id.* at 2208. Using these water service providers, Mr. Johnson compared the impact and membership fees for both 5/8-inch meters and 1-inch meters. The impact fee from the seven other water service providers ranged from $900 per lot to $2,050 per lot, with an average impact fee of about $1,167 per lot, for the 5/8-inch meter. For the 1-inch meter, the impact fees ranged from $900 to $2,650 per lot and had an average impact fee of $1,501. Only three of the comparison water districts also charged a membership fee for either meter size. Of those that did charge a membership fee, the fee for a 5/8-inch meter ranged in price from around $83 to $2,000 and the average fee was around $328. The

membership fee for the 1-inch meter ranged from around $133 to $2,000, with an average fee of around $351. Mr. Johnson also testified that none of the other providers require a developer to drill water wells as a condition for water service.

Mr. Myers compared Deer Creek to twelve providers selected because he considered them "valid comparisons" to Deer Creek. *Id.* at 2451. Eleven of the twelve water providers charged a membership fee, ranging from $180 to $4,000 per unit, with the average fee of around $1,575. Only three providers charged an impact fee. These impact fees ranged from $500 to $1350 per lot and had an average fee of $950. Mr. Myers testified that in gathering the comparison data, he did not differentiate between the fees charged for 5/8-inch meters and 1-inch meters. Mr. Myers also testified that none of the twelve comparison service providers required developers to drill wells as a condition for service.

Ms. Wells-Bethel testified that the conditions for service offered to Garrett "contain[ed] boiler plate language" from Deer Creek and "[u]sually the only changes are due to the location of the development, what lines could be needed, the locations and sizes of the lines, and then if a number of wells is needed, that would be the only change. Everything else should be the same." *Id.* at 2412. However, she also testified that not all members are required, as a condition of service, to transfer their water or surface rights; pay any amount in excess of impact fees for water wells or infrastructure; pay for three-phase electricity to well sites; pay inspection fees; warrant water lines for two years; or post maintenance bonds. Instead, she testified

Deer Creek unilaterally decides which members must do these things based on "obvious need." *Id.* at 2366.

At the end of Garrett's case-in-chief, Deer Creek brought a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure Rule 52(c). Deer Creek argued the evidence presented by Garrett did not meet its burden to demonstrate Deer Creek's rates were unreasonable, excessive, and confiscatory as required for a loss of protection under 7 U.S.C. § 1926(b). Instead, Deer Creek argued the evidence demonstrated that the charges to Garrett of building the infrastructure for water service were exactly the costs to Deer Creek in providing that service. Garrett opposed the motion. After argument, the court deferred ruling on the motion.

**3.　District Court Decision**

In August 2021, the district court entered final judgment in favor of Garrett on its claim seeking the Declaration re Availability because Deer Creek had failed to make services available to Garrett. The court concluded Deer Creek's conditions for service to the Proposed Development were excessive, unreasonable, and confiscatory. In reaching that conclusion, the district court determined the evidence weighed in favor of Garrett as to each factor we identified in *Rural Water Dist. No. 1, Ellsworth Cnty. v. City of Wilson*, 243 F.3d 1263, 1271 (10th Cir. 2001).

**a.　*More than a fair profit***

First, the court concluded Deer Creek's conditions for providing water service to the Proposed Development allowed Deer Creek to yield "more than a fair profit."

21

App. Vol. VIII at 2009. The district court reasoned that the four additional wells Deer Creek required Garrett to drill would provide an overall benefit to the water system at no cost to Deer Creek. Specifically, "adding four wells to Deer Creek's system will increase the average systemwide pressure by .29 psi." *Id.* at 2003. The district court determined Deer Creek would profit from this pressure increase based on its finding that "excess water produced by the four wells will go outside the Proposed Development" and may be sold to other Deer Creek customers. *Id.* at 2003, 2010.

The district court also supported its conclusion that the conditions would yield more than a fair profit by considering Deer Creek's impact fees. The district court explained that "the impact fee [charged by Deer Creek] represents the customer's pro rata share of the wells and related infrastructure necessary to supply water to the customer." *Id.* at 2001. The court noted the total impact fee charged to Garrett would be $1,275,000, and that amount would be credited toward Garrett's cost of drilling the four water wells. But, where the total cost of drilling the four wells would be $1,600,000, the court found Deer Creek's conditions require Garrett to pay at least $325,000 more than the credited impact fees just to cover the cost of the four wells. The district court concluded this amount represents a profit to Deer Creek. Finally, the court relied on the finding that "[b]ased on the averages in 2017, Deer Creek makes an approximate profit of 22% on water sales" to conclude Deer Creek's conditions for providing water service would allow Deer Creek "to yield more than a fair profit." *Id.* at 2006, 2011.

22

b.    *Rate disproportionate to services rendered*

Second, the court concluded Deer Creek's conditions "establish[] a rate that is disproportionate to the services rendered." *Id.* at 2011–12. In considering this factor, the court relied on its finding "that Deer Creek is unwilling to bear any of the initial costs associated with supplying water to the Proposed Development." *Id.* at 2006, 2011. The court determined the "only initial service to be performed by Deer Creek in connection with establishing water service for the Proposed Development . . . is the setting of water meters at each lot." *Id.* at 2011. Where Deer Creek's $2,500 membership fee more than covered the $150–$300 cost of the water meters, the district court concluded the rate charged is disproportionate to the services rendered.

c.    *Comparison to other similarly situated water districts*

Third, the court concluded the evidence demonstrated that "other, similarly situated [rural water associations] do not" require similar conditions prior to providing water services. *Id.* at 2012–13. This conclusion was based on the finding that neither expert witness was "aware of water providers, other than Deer Creek, which require a customer to drill its own well as a condition of receiving service." *Id.* at 2012; *Id.* at 2003–04. The district court also relied on the finding that Deer Creek is one of only a few providers that charge both an impact and a membership fee and that Deer Creek's fees are above the average charged by other providers. Based on these findings, the district court concluded this factor weighed in favor of Garrett.

23

### d.    Arbitrary classifications

Last, the court concluded the evidence demonstrated Deer Creek had established "arbitrary classification[s] between various users." *Id.* at 2013–14. The district court based this conclusion on its findings that Deer Creek had paid some customers for water rights and some landowners for surface rights in the past. The district court also considered unenlightening Deer Creek's "obvious need" test for requiring Garrett to pay for additional infrastructure beyond the impact fee while not requiring other members to do so. *Id.* at 2014. Without explaining why some members were paid for water rights and some were not, or why developer customers were required to pay for additional infrastructure and residential customers were not, the district court concluded Deer Creek's conditions for service created arbitrary classifications between users.

After finding each *Ellsworth* factor weighed in favor of Garrett, the district court concluded the cost was so unreasonable, excessive, and confiscatory as to not make services available to Garrett. Because Deer Creek had failed to make services available to Garrett, the district court declared Garrett "is not required to obtain water service from [Deer Creek] and is free to obtain water from any other provider." *Id.* at 2016. Deer Creek timely appealed.

## II.    DISCUSSION

On appeal, Deer Creek argues the district court (A) lacked subject matter jurisdiction over Garrett's remaining claim seeking the Declaration re Availability, and (B) erred in finding Deer Creek did not make services available to Garrett.

24

Proceeding in two parts, we conclude that the district court correctly determined it had subject matter jurisdiction over Garrett's claim and that the record supports the district court's factual findings regarding Deer Creek's conditions for service. Accordingly, we affirm the district court's final judgment.

### A.    Subject Matter Jurisdiction

"We review questions of justiciability—including standing and ripeness—de novo." *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 898 (10th Cir. 2016). On appeal, Deer Creek challenges the district court's subject matter jurisdiction over this dispute for three reasons. Deer Creek contends (1) Garrett lacks standing to bring its claim, (2) the claim is not ripe for review, and (3) the district court's judgment is an impermissible advisory opinion. We address each contention in turn.

### 1.    Article III Standing

Article III limits the federal judicial power to resolving "Cases" and "Controversies." U.S. Const. art. III, § 2. Based on "the separation-of-powers principles underlying that limitation, we have deduced a set of requirements that together make up the 'irreducible constitutional minimum of standing.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish Article III standing, Garrett "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)

(quoting *Lujan*, 504 U.S. at 560–61). Although Deer Creek contends Garrett lacks

constitutional standing as required by Article III, it fails to dispute any of the three

required elements. "Because Article III standing is a jurisdictional issue, we must

satisfy ourselves that it exists here." *Felix v. City of Bloomfield*, 841 F.3d 848, 854

(10th Cir. 2016).

We agree with the district court that Garrett has established each element

required for Article III standing. Garrett alleged a cognizable injury in fact: it is

"unable to obtain a feasible water service provider due to Deer Creek's claim to

exclusivity" over the proposed development. App. Vol. I at 254. This deprivation is

fairly traceable to Deer Creek's conditions for water service and its claim of

exclusivity over the service area. And the alleged injury is redressable by a favorable

decision because if Deer Creek's exclusive service area did not include Garrett's

property, Garrett could obtain water service from a different provider. Moreover,

Oklahoma City has indicated it would provide water service to the Proposed

Development if Garrett were released from Deer Creek's exclusive service area.

Accordingly, we are satisfied that Garrett has Article III standing to assert its claim.

Instead of arguing against any element of Garrett's Article III standing on

appeal, Deer Creek argues Garrett lacks standing based on the language and purpose

of § 1926(b). Because the language of the statute protects rural water associations

from encroaching municipalities, Deer Creek argues landowners "within a rural water

association's protected territory [are] not within the class of people" who may seek a

declaration of rights related to § 1926(b). Appellant's Br. at 15. Although the

26

argument is not poised as such, Deer Creek essentially contends Garrett falls outside the zone-of-interests of § 1926(b). *Id.* at 15. Although this argument may have had merit if adequately raised in response to Garrett's substantive claims, it does not implicate Garrett's Article III standing.

The zone-of-interests doctrine was "traditionally viewed as a prudential- or statutory-standing requirement," but the Supreme Court has clarified the doctrine is not "actually a matter of standing at all; instead, it merely asks whether a particular federal cause of action 'encompasses a particular plaintiff's claim.'" *In re Peeples*, 880 F.3d 1207, 1213 (10th Cir. 2018) (quoting *Lexmark*, 572 U.S. at 127); *see also Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017) (noting "the label 'prudential standing' was misleading, [because] the requirement at issue is in reality tied to a particular statute" rather than being tied to jurisdictional limitations) (quoting *Lexmark*, 572 U.S. at 127, 128 n.4). This inquiry does not implicate subject matter jurisdiction because "'the absence of a valid (as opposed to arguable) cause of action'" does not alter a federal court's "'statutory or constitutional *power* to adjudicate the case.'" *Lexmark*, 572 U.S. at 128 n.4 (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)). Because the zone-of-interests inquiry is not jurisdictional, it can be waived. *See Niemi v. Lasshofer*, 770 F.3d 1331, 1345 (10th Cir. 2014) (noting "statutory standing" arguments may be waived).

As an initial matter, Deer Creek has not adequately briefed the zone-of-interests issue here. "The Federal Rules of Appellate Procedure require appellants to

provide, under an appropriate heading, an argument containing 'appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.'" *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1133 n.4 (10th Cir. 2004) (quoting Fed. R. App. P. 28(a)(9)); *see also* Fed. R. App. P. 28(a)(8)(A). We have acknowledged that "[i]t is a party's duty to develop an argument if it wishes a determination by this court." *Grissom v. Roberts*, 902 F.3d 1162, 1173 (10th Cir. 2018). This duty is in part required to allow an opposing party the opportunity to respond. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) (noting the failure to adequately raise an issue in the opening brief "robs the appellee of the opportunity . . . to present an analysis of the pertinent legal precedent that may compel a contrary result").

Before this court, Deer Creek relies on the statutory language and purpose of § 1926(b) to argue Garrett lacks standing to bring this action. But Deer Creek makes this argument under the legal framework of subject matter jurisdiction and does not cite any legal authority for the zone-of-interests issue, or even use the phrase "zone-of-interests," in its opening brief. Without proper context, Garrett was not adequately alerted to a zone-of-interests issue such that it had an opportunity to respond.

Even if Deer Creek had adequately briefed this issue before us, it has waived it by not presenting a zone-of-interests argument to the district court. We generally consider arguments that were not raised before the district court "waived for purposes of appeal." *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013). "This rule equally applies where a litigant changes to a new theory on appeal that falls under the

28

same general category as an argument presented at trial or presents a theory that was discussed in a vague and ambiguous way." *Id.* (internal quotations omitted).

Deer Creek asserts the zone-of-interests issue is not waived because it "raised the issue immediately on a motion to dismiss." Oral Argument at 3:55–4:07. A careful review of the motion, however, belies Deer Creek's argument. Deer Creek generally challenged Garrett's constitutional and prudential standing pursuant to Federal Rule of Civil Procedure 12(b)(1). But Deer Creek's motion did not preserve a zone-of-interests issue for appeal for two reasons. First, a zone-of-interests challenge to a plaintiff's claim is properly brought under Rule 12(b)(6), rather than Rule 12(b)(1), because the issue implicates the merits of the claim, not the court's jurisdiction. *See Kerr v. Polis*, 20 F.4th 686, 699–700 (10th Cir. 2021) (analyzing an issue of political subdivision standing under Rule 12(b)(6) rather than Rule 12(b)(1) because "claims brought by political subdivisions ha[ve] nothing to do with our jurisdiction, but rather go[] to the merits of the [p]laintiffs' claims"); *N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1230 (10th Cir. 2021) (noting prudential standing ripeness concerns are properly analyzed under Rule 12(b)(6) rather than Rule 12(b)(1) because they do not implicate subject matter jurisdiction); *see also VR Acquisitions LLC v. Wasatch Cnty.*, 853 F.3d 1142, 1146 n.4 (10th Cir. 2017) (collecting cases from other circuits applying Rule 12(b)(6) rather than Rule 12(b)(1) to address issues of statutory standing). Second, Deer Creek did not raise a zone-of-interests issue as to Garrett's claim seeking a Declaration re Availability in its motion to dismiss. Instead, Deer Creek asked the district court to dismiss Garrett's claim

29

seeking a Declaration re Exclusivity based on a lack of standing. Deer Creek argued

Garrett lacked standing to seek a Declaration re Exclusivity because such a

declaration would affect only a non-party water service provider's ability to provide

water. Specifically, Deer Creek contended "Garrett itself has no cognizable stake in

the outcome of this litigation." App. Vol. I at 32. Although this argument sought to

challenge standing, it does nothing to preserve the zone-of-interests issue presented

on appeal. In this court, Deer Creek challenges the merits of Garrett's claim seeking a

Declaration re Availability by relying on the text and purpose of § 1926(b) to argue

Garrett has no rights protected by the statute. But Deer Creek never made that

argument in the district court. Instead, Deer Creek vaguely argued against Garrett's

constitutional and prudential standing based on the purpose of the statute in a motion

pursuant to Rule 12(b)(1).

The zone-of-interests issue was not preserved in the district court and not

adequately raised on appeal.[4] We therefore do not consider it further.

---

[4] Deer Creek's arguments against standing in its motion for summary judgment also do not preserve the zone-of-interests issue on appeal. There, Deer Creek continued to argue Garrett "simply has no standing to assert the rights of the City or anyone else, other than those of [Garrett] itself." App. Vol. II at 404. Deer Creek did not rely on the language or purpose of the statute and did not expressly raise a zone-of-interests issue. These vague and ambiguous arguments do not preserve a zone-of-interests issue for consideration on appeal. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013). Accordingly, Deer Creek's Motion for Summary Judgment also does not preserve the zone-of-interests issue.

## 2.    Ripeness

Deer Creek also contends the district court lacked subject matter jurisdiction over Garrett's claim under the doctrine of ripeness. "Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) (internal quotation marks omitted). We agree with the district court that Garrett's claim is both constitutionally and prudentially ripe.

Our constitutional ripeness analysis focuses on "whether the harm asserted has matured sufficiently to warrant judicial intervention." *Kan. Jud. Rev. v. Stout*, 519 F.3d 1107, 1116 (10th Cir. 2008). "If a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *N. Mill St.,* 6 F.4th at 1229. The injury alleged here is that Garrett is unable to develop its property due to Deer Creek's claim of exclusivity over the service area and the imposition of conditions on the provision of service that are excessive, unreasonable, and confiscatory. The alleged unavailability of water service for the Proposed Development is an injury that is "sufficiently imminent" for constitutional ripeness.

Garrett's claim is also prudentially ripe. To determine a claim's prudential ripeness, this court "examin[es] both the fitness of the issues raised . . . for judicial review and the hardship to the parties from withholding review." *United States v. Vaquera–Juanes*, 638 F.3d 734, 737 (10th Cir. 2011). "A case meets the first prong if

31

it does not involve uncertain or contingent events that may not occur at all (or may not occur as anticipated)." *Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1275 (10th Cir. 2012) (*Glenpool II*) (quotation marks omitted). "The second prong addresses whether the challenged action is a direct and immediate dilemma for the parties." *Id.* (internal quotation marks omitted).

Garrett claims it satisfies the first prong because the injury—delay in developing its property based on the inability to obtain feasible water services—is not "contingent upon any future events." *Glenpool II*, 698 F.3d at 1276. Deer Creek disagrees and argues Garrett's claim is contingent upon the future event of Garrett obtaining rezoning of the property to allow for the Proposed Development. But Garrett's injury is not contingent on Garrett rezoning the property. Rather, Garrett's inability to obtain feasible water services is caused by Deer Creek's conditions for water service. And these conditions apply whether Garrett builds 510 homes as allowed with rezoning or 80 homes under the existing zoning. *See* App. Vol. XI at 2716–23; *see also id.* at 2719–20 (categorizing any "addition[] or development . . . containing two (2) or more residences" as a development). Although the actual cost of satisfying Deer Creek's conditions may change, depending on the zoned density, the conditions for service still require Garrett to cover almost every cost of initiating service. And the City Planning Department recommended approving Garrett's annexation petition subject to Deer Creek's release of its exclusivity over the Proposed Development, which Deer Creek denied. Accordingly, Garrett's injury is not contingent upon a future event and the claim is fit for review. Garrett's claim also

satisfies the second prong of prudential ripeness. Resolving Garrett's claim now does not increase any hardship to Deer Creek, while waiting to resolve Garrett's claim until after rezoning will increase the hardship for Garrett by delaying development of the property. Accordingly, Garrett's claim is prudentially ripe.

### 3.    Advisory Opinion

Deer Creek next contends the district court's declaratory judgment amounts to an impermissible advisory opinion. Before seeking relief pursuant to the Federal Declaratory Judgment Act, a plaintiff is required to establish an Article III case or controversy. *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 946 (10th Cir. 2003) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–41 (1937)). Further, the plaintiff "must assert a claim for relief that, if granted, would affect the behavior of the particular parties listed in [the] complaint." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) (citations omitted). Relief is unavailable under the Act if it will merely "guide third parties (i.e., those not parties to the lawsuit) in their future interactions with a plaintiff." *Id.* at 1026. The basic inquiry is to determine whether the controversy is "'real and substantial, . . . admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts.'" *Id.* (quoting *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir.1993)).

Deer Creek argues the declaratory judgment issued by the district court is an advisory opinion because the question at issue "provides guidance to a third party on an issue that is hypothetical." Appellant's Br. at 23–24. Deer Creek points to two

hypotheticals that it argues make any declaration in this case an advisory opinion: (1) Garrett had not received the zoning change required for the Proposed Development, and (2) the Proposed Development had not yet been developed. We are not persuaded.

First, as set out in the previous section, the controversy between the parties about the conditions for water service is not contingent on Garrett rezoning the property. Where Deer Creek's conditions apply under either zoning density, there remains a "real and substantial" controversy between the parties over the conditions and whether or not they are so onerous as to make service unavailable to Garrett. *See* App. Vol. XI at 2716–23; *see also id.* at 2719–20 (categorizing any "addition[] or development . . . containing two (2) or more residences" as a development).

Second, Deer Creek relies on *Norvell v. Sangre de Cristo Dev. Co., Inc.*, 519 F.2d 370 (10th Cir. 1975), to argue that because the Proposed Development has not yet been developed the declaratory judgment is an advisory opinion. In *Norvell*, New Mexico sought a judgment declaring that it had jurisdiction over a development company and its activities under a lease granted by an Indian Tribe on reservation land outside of Santa Fe. *Id.* at 371–72. We concluded New Mexico's claim did not present an actual case or controversy in part because development under the lease at issue was "in 'limbo'" and "[a]ll progress on the project was . . . at a standstill." *Id.* at 376. In that case, however, the plans for development "were, at best, yet 'on the drawing board' for all practical purposes." *Id.* at 374. Here, Deer Creek has not demonstrated that Garrett's plans to build the Proposed Development are in limbo for

34

any reason other than it needing to obtain a water service provider. *See* App. Vol. I at 59–60 (noting the Board of County Commissioners denied Garrett's initial request for rezoning because "the Property currently does not have water . . . services available to it"). Thus, there is an "actual controversy" between the parties. Deer Creek has asserted exclusivity over the area for water service protected by § 1926(b), and Garrett maintains that the conditions for Deer Creek's service are so excessive, unreasonable, and confiscatory that Deer Creek has not made service available. The declaratory judgment settles the right of Deer Creek to claim exclusivity over the Proposed Development. Further, a declaratory judgment as to Deer Creek's exclusivity over the land presents a determination that "will have some effect in the real world." *Prier v. Steed*, 456 F.3d 1209, 1213 (10th Cir. 2006). Without Deer Creek's claim to exclusivity, Garrett could obtain water from a different service provider, including Oklahoma City.

In summary, Garrett has Article III standing, the action is ripe for decision, and a declaration would not constitute an advisory opinion. As a result, the district court had subject matter jurisdiction over Garrett's claim seeking a declaration that Deer Creek's conditions rendered water service unavailable, thereby eliminating Deer Creek's exclusive right to service the Proposed Development.

### B. 7 U.S.C. § 1926(b)

We now turn to Deer Creek's challenges to the district court's findings of fact and conclusions of law reached after the three-day bench trial. "In an appeal from a bench trial, . . . we review the district court's factual findings for clear error, and its

35

legal conclusions de novo." *Holdeman v. Devine*, 572 F.3d 1190, 1192 (10th Cir. 2009) (quotation marks omitted). Factual findings "are clearly erroneous when they are unsupported in the record," or if "we have the definite and firm conviction that a mistake has been made" after reviewing all the evidence. *Id.* (quotation marks omitted). We "view the evidence in the light most favorable to the district court's ruling and must uphold any district court finding that is permissible in light of the evidence." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1305 (10th Cir. 2015) (quotation marks omitted).

Under this standard, Deer Creek must show more than the viability of its own theory to warrant remand. "That the record supports a view of the evidence that is permissible but contrary to the trial court's findings is not sufficient to warrant upsetting the lower court's findings." *Holdeman*, 572 F.3d at 1192. Instead, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).

Deer Creek challenges the district court's decision on two grounds. First, Deer Creek argues the district court misapplied the applicable legal standard for determining whether a rural water association has "made services available." Second, Deer Creek argues the district court's determination of each relevant factor comprising that legal standard is without evidentiary support. We address each challenge in turn.

36

## 1.    Legal Standard

Deer Creek argues the district court erred in applying the legal standard to determine whether Deer Creek "made services available" under § 1926(b). To receive the protections afforded by this section, Deer Creek must establish it "made services available" to the service area encompassing Garrett's property. *Ellsworth*, 243 F.3d at 1269. This determination is focused "primarily on whether the water association has in fact made service available, i.e., on whether the association has proximate and adequate 'pipes in the ground' with which it has served or can serve the disputed customers within a reasonable time." *Id.* at 1270 (internal quotation marks and emphasis omitted).

As discussed, even where a rural water association satisfies the "pipes-in-the-ground" test, a party challenging the rural water association's § 1926(b) protection can demonstrate the association has not "made services available" if the rates or conditions for service are "unreasonable, excessive, and confiscatory." *Id.* at 1271. We require the party challenging the rural water association's protection to bear the burden of establishing that the rates or conditions meet this standard. *Douglas*, 659 F.3d at 981. To determine whether the rates or conditions are unreasonable, excessive, and confiscatory, we have recognized four non-exclusive factors to consider in the totality of the circumstances (the "*Ellsworth* factors"). *Ellsworth*, 243 F.3d at 1271 (citing *Shawnee Hills Mobile Homes*, 537 P.2d at 218–21).

The district court found that each *Ellsworth* factor weighed in favor of Garrett, citing evidence from the record and providing explanations for its conclusions as to

37

each factor. Based on the totality of the circumstances, the district court determined, "Deer Creek's fees and costs are excessive, unreasonable, and confiscatory as they relate to Garrett and the Proposed Development." *Id.* at 2015. Because Deer Creek had not made water service available to Garrett, the district court declared that Deer Creek could not claim exclusivity over Garrett's property under § 1926(b).

Deer Creek makes five arguments as to why the district court erred in applying this legal standard. First, although Deer Creek concedes the district court articulated the correct standard to evaluate costs pursuant to § 1926(b), it contends the district court erred by "mechanically appl[ying]" the *Ellsworth* factors. Appellant's Br. at 33. According to Deer Creek, the district court should have "look[ed] at the fact that Deer Creek was simply charging its own cost to improve Garrett's property so that the Proposed Development can receive water," *id.* at 52, and should have further acknowledged that "Deer Creek is not making a profit on this transaction, and certainly is not making more than a fair profit," *id.* To be sure, Deer Creek presents an interpretation that was possible from the evidence. The fact that the district court reached a different conclusion, however, does not suggest its application of the *Ellsworth* factors was erroneous.

As Deer Creek acknowledges, the district court considered each of the four *Ellsworth* factors. The first of these factors addresses whether Deer Creek's conditions for water service allow it to yield more than a fair profit. *Ellsworth*, 243 F.3d at 1271. After evaluating the supporting evidence, the district court concluded this factor weighed against Deer Creek and in favor of Garrett. Deer Creek

simply disagrees with the District Court's view of the evidence. Then, after advocating for a contrary finding that the profit was fair, Deer Creek contends this factor—as found by Deer Creek rather than the district court—should outweigh all others. We have instructed, however, that "[n]o one factor is dispositive and the determination of whether the practice is excessive, unreasonable, and confiscatory depends on an assessment of the totality of the circumstances." *Id*. Irrespective of how the district court resolved the first factor, its consideration of factors beyond Deer Creek's projected profit was not error.

Second, Deer Creek argues the district court failed to resolve doubts in its favor as required by this court's precedent. In its argument, however, Deer Creek does not identify any finding by the district court that was "in doubt" but resolved in favor of Garrett. Instead, Deer Creek seems to argue that any *dispute* as to whether a condition is excessive, unreasonable, and confiscatory should be resolved in its favor. We have previously rejected this understanding in the context of § 1926(b), clarifying that "[t]his presumption does not mean . . . that all doubts and evidentiary uncertainties must be resolved in favor of the indebted water district or that [the municipality] must meet a 'clear and convincing' standard on every issue for which it carries the burden of proof." *Douglas*, 659 F.3d at 976 n.4. Instead, we have acknowledged that "every federal court to have interpreted § 1926(b) has concluded that *the statute* should be liberally interpreted." *Id.* (emphasis in original). Where the district court did not resolve any doubt in the statutory interpretation of § 1926(b)

39

against Deer Creek, we reject Deer Creek's argument that by resolving evidentiary disputes against it the district court erred in applying the legal standard.

Third, Deer Creek contends the district court erred by "focusing exclusively on the impact on Garrett" rather than the cost to Deer Creek of providing service. Appellant's Br. at 30. Deer Creek relies on *Public Water Supply Dist. No. 3 of Laclede Cnty. v. City of Lebanon*, 605 F.3d 511 (8th Cir. 2010). There, a rural water association filed suit against a municipality and alleged the municipality violated § 1926(b) by providing water and sewer services to a development in the rural water association's service area. *Laclede*, 605 F.3d at 521–22. According to the municipality, the rural water association had not made services available to the development because it required the developer to "construct a new stand-alone [wastewater] facility to serve the development." *Id.* at 521. The developer rejected the proposal because the development was intended "to be an 'upper-end' development, and . . . [the] customers would not tolerate the individual septic systems involved in the [rural water association's] proposal." *Id.* at 522. The district court concluded the rural water association had not made services available and granted the municipality's motion for summary judgment because the proposal "would not reasonably conform to the ideals and standards a developer or customer in a similar situation would expect." *Id.* (internal quotation marks omitted). The Eighth Circuit disagreed, concluding, "The district court misapplied the 'made service available' test by improperly focusing on the preferences of the potential recipient of the service." *Id.* at 522. The Eighth Circuit further noted the district court

40

"cited no authority for the proposition that courts should give dispositive effect to 'the ideals and standards a developer or customer in a similar situation would expect.'" *Id.*

Here, the district court did not consider Garrett's preferences in determining whether Deer Creek has made services available.[5] Instead, the district court considered the cost of the proposed conditions to Garrett. Unlike in *Laclede*, there is binding authority from this circuit that customer costs are relevant to the analysis of whether services have been made available. *See Ellsworth*, 243 F.3d at 1271–72 (holding the consideration of cost is appropriate to evaluate whether services have been made available). Thus, the district court's consideration of Garrett's costs to meet Deer Creek's conditions for service was a proper application of this circuit's legal standard.

Fourth, Deer Creek argues the district court inappropriately placed the burden on Deer Creek to prove the costs were not excessive. As previously indicated, the party challenging the rural water association's protection bears the burden of establishing that the conditions imposed by the water district are excessive, unreasonable, and confiscatory. *Douglas*, 659 F.3d at 980–81. The district court appropriately announced the burden, stating that Garrett must "prove[] by a preponderance of the evidence that [Deer Creek's] costs are unreasonable, excessive

---

[5] The district court did find Mr. Garrett "testified that his preference for the development is to use 1-inch meters." App. Vol. VIII at 2004. The district court, however, did not rely on this finding to make any conclusion as to whether Deer Creek's conditions for service were excessive, unreasonable, and confiscatory.

and confiscatory." App. Vol. VIII at 2008. Deer Creek claims on appeal that in application, the district court "flipped the burden on its head, simply declaring *ipse dixit* that Deer Creek failed to make service available to Garrett." Appellant's Br. at 31. We disagree.

As we discuss in greater detail in the next section, the district court supported its decision on each factor with evidence from the record. In light of the totality of that evidence, the district court concluded Garrett had established by a preponderance of the evidence that Deer Creek's costs made service unavailable. Accordingly, the district court did not "simply declare" Deer Creek had failed to make services available to Garrett.

As its fifth and final challenge to the district court's analytical approach, Deer Creek argues the district court erred by failing to determine whether Deer Creek's conditions were "prohibitive." This court has noted that "[a]lthough the costs of services need not be competitive with the costs of services provided by other entities, the protection granted to rural water districts by § 1926(b) should not be construed so broadly as to authorize the imposition of any level of costs." *Ellsworth*, 243 F.3d at 1271. We reaffirmed the approach of considering costs in the analysis of whether services are available, stating,

> We mitigate the tendency of monopolists to price exorbitantly by conditioning the right to earn the governmentally sanctioned monopolist status on the water association's employing prices that, even if high, are not prohibitive. The doctrine's aim is to help avoid the unattractive scenario of water remaining unavailable as a practical matter due to excessively high monopolistic pricing without legal recourse for consumers and with no additional market entry by a supplier in sight.

> We need not define what it means for a price to be "so excessive that it
> has not made the services available," for the purpose of § 1926 analysis,
> that is for the district court to determine on remand, perhaps with the
> benefit of expert witness testimony on the subject.

*Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 719

(10th Cir. 2004) (quoting *Ellsworth*, 243 F.3d at 1271).

Relying on *Pittsburg*, Deer Creek argues the district court's conclusion was in

error because "Garrett provided no evidence of [] monopolistic pricing," nor did

Garrett provide evidence that it was literally prohibited by the cost of Deer Creek's

services. Appellant's Br. at 49–50. This argument assumes that by using the terms

"prohibitive" and "excessively high monopolistic pricing," we defined "what it

means for a price to be 'so excessive that [a rural water association] has not made the

services available,' for the purpose of the § 1926 analysis." *Pittsburg*, 358 F.3d

at 719 (quoting *Ellsworth*, 243 F.3d at 1271). The *Pittsburg* court, however, "did not

define what it means for a price to be 'so excessive that [a rural water association]

has not made the services available . . . .'" *Id.* (quoting *Ellsworth*, 243 F.3d at 1271).

Instead, we turned to *Ellsworth* for the applicable legal standard, using the four non-

exclusive factors to determine whether costs were excessive under the totality of the

circumstances. *Id.* at 721. The district court followed the same approach here.

In sum, we see no error in the district court's application of the legal standard.

The district court considered each of the four *Ellsworth* factors to determine whether,

under the totality of the circumstances, Deer Creek's conditions were so excessive,

unreasonable, and confiscatory as to deny service to Garrett. It appropriately placed

the burden on Garrett to meet this standard. Moreover, the district court properly considered the cost to Garrett to meet the conditions, rather than any individual preference of Garrett. We now address Deer Creek's concerns with how the district court weighed the evidence as challenges to the district court's factual findings.

## 2.    *Ellsworth* Factors

According to Deer Creek, the evidence at trial showed Deer Creek's conditions for water service were not unreasonable, excessive, and confiscatory. Deer Creek maintains the conditions are "virtually identical to the costs Deer Creek is incurring to provide service to the Proposed Development." Appellant's Br. at 35. According to Deer Creek, shifting the actual costs of initiating water service to a developer is reasonable, and the district court's legal conclusions to the contrary are unsupported by the record.

Under § 1926(b), Deer Creek fails to make service available if it conditions water service on terms that are "unreasonable, excessive, and confiscatory." *Ellsworth*, 243 F.3d at 1271. We evaluate Deer Creek's conditions for service by considering "the totality of the circumstances," including the four non-exclusive *Ellsworth* factors. *Id.* Recall that these factors consider:

> (1) whether the challenged practice allows the [association] to yield more than a fair profit; (2) whether the practice establishes a rate that is disproportionate to the services rendered; (3) whether other, similarly situated [associations] do not follow the practice; [and] (4) whether the practice establishes an arbitrary classification between various users.

*Id.* The burden to show unavailability of water service based on the cost of service is on the party challenging the protected service area. *Douglas*, 659 F.3d at 981; *see*

44

*also id.* (citing *Shawnee Hills Mobile Homes*, 537 P.2d at 217 (holding that water rates set by a municipal corporation such as a water district are generally presumed to be valid and reasonable until the contrary has been established by the challenging party)). Application of the four factors implicate many factual considerations that must be weighed by the district court. Here, the district court determined each *Ellsworth* factor weighed in favor of Garrett. It therefore concluded the conditions imposed by Deer Creek were unreasonable, excessive, and confiscatory.

Where no single factor is determinative, Deer Creek has the burden on appeal to convince this court that the district court erred significantly enough to justify overturning a multifactor balancing test on clear error review. As we now explain, it cannot meet that burden.

### a.    *More than a fair profit*

The first *Ellsworth* factor looks to "whether the challenged practice allows the [association] to yield more than a fair profit." *Id.* The district court concluded this factor weighed in favor of Garrett. Specifically, the district court relied on three findings to support this conclusion: (1) Deer Creek will profit from the sale of excess water from the four wells drilled by Garrett; (2) Garrett is required to pay the actual cost of wells and necessary infrastructure rather than just the impact fee, which represents a customer's pro rata share of the cost of the wells and necessary infrastructure; and (3) Deer Creek is already selling water at approximately a 22% profit margin. From these three findings, the district court weighed this factor in favor of Garrett, stating that Deer Creek's conditions require Garrett "to bear the

45

costs and risks associated with the provision of water service to the development, but Deer Creek reaps substantially all of the benefits." App. Vol. VIII at 2010; *see also* App. Vol. XI at 2713–23.

Deer Creek argues this conclusion was impermissible for four reasons: (1) the excess water coming from the four wells does not represent a profit to Deer Creek, (2) developers "always" pay the cost of infrastructure, (3) Deer Creek offsets the infrastructure costs with impact fees, and (4) Deer Creek's profit from the rate charged to the new members from the Proposed Development will be used for maintenance to the system. We consider each argument in turn.[6]

First, Deer Creek contends the district court erred in treating as profit the anticipated revenues from excess water generated by Garrett's four wells and sold outside the Proposed Development. The district court found that the excess water produced by Garrett's four wells "will increase the average systemwide pressure by 0.29 psi." App. Vol. VIII at 2003. The court further concluded "Deer Creek will be able to sell the excess water while taking no risk in obtaining it." App. Vol. VIII

---

[6] In this section, Deer Creek again argues the district court failed to "compare the prices Deer Creek charged [Garrett] to Deer Creek's actual cost, to the cost of any other provider, or to anything else." Appellant's Br. at 34. Deer Creek argues the district court "looked at virtually no additional information" and "simply and erroneously declared in a vacuum" that the conditions for service were unreasonable, excessive, and confiscatory. As we noted in the previous section, the district court did consider the evidence presented at trial and supported each *Ellsworth* factor with factual findings. The district court also compared Deer Creek's conditions against the conditions imposed by similarly situated water associations. Based on the record, we are not persuaded by Deer Creek's argument that the district court erred in applying the legal standard by failing to compare what the cost would be to Deer Creek without the conditions, another service provider, or "anything else."

at 2010; *see also* App. Vol. IX at 2513–14 (testifying four wells can increase the overall system pressure). We agree with Deer Creek that the district court erred in relying on this slight water pressure increase to support its conclusion that Deer Creek's conditions allow it to yield more than a fair profit. At trial, Mr. Myers testified that an average increase of 0.29 psi would be "infinitesimal." App. Vol. IX at 2514. Garrett did not offer any evidence to the contrary. There is also no support in the record that a 0.29 psi increase within a water system averaging a total of 65–75 psi would translate into any additional water sales. In other words, there is no evidentiary support that Deer Creek will yield any profit based on the infinitesimal water pressure increase. Accordingly, we agree with Deer Creek that the district court erred in finding a monetary benefit to Deer Creek for hypothetical increased sales based on an average 0.29 psi water pressure increase.

However, the district court supported its conclusion that Deer Creek would obtain an unfair profit under the stated conditions with two additional findings. The district court found that Deer Creek's conditions required Garrett to pay for the installation of water service, while providing Deer Creek with control over the drilling and water quality process, as well as water and property rights over the wells and water produced. The district court also noted that Deer Creek set a uniform impact fee for each user intended to "represent the customer's pro rata share of the cost of the wells and related infrastructure necessary to supply water to the customer." App. Vol. VIII at 2001. Although Deer Creek permitted Garret to offset the costs of building the wells against the impact fees charged to the Proposed

47

Development, the actual cost of well construction was estimated to exceed the impact fees by at least $325,000. Thus, unlike other users, Deer Creek required Garrett to pay the actual cost of the wells and required infrastructure, not just the pro rata share as represented by impact fees. The district court also relied on its finding that Deer Creek was "selling water at [an] approximate 22% profit margin" to conclude the conditions for water service to the Proposed Development would allow Deer Creek to yield more than a fair profit.

Thus, even disregarding the district court's reliance on the average 0.29 psi water pressure increase, its conclusion that Deer Creek would recover an unfair profit under the proposed conditions is adequately supported. The evidence shows Deer Creek will recover $325,000 more than the impact fees charged to other users, and it already enjoys a 22% profit margin. Despite Deer Creek's disagreement, these additional findings are supported by the record evidence and support the district court's conclusion as to this factor.

Second, Deer Creek challenges the district court's reliance on the condition that Garrett pay for required infrastructure because "developers always pay the cost of infrastructure." Appellant's Br. at 37. As an initial matter, Deer Creek relies on an unpublished opinion from this court where we noted "requiring the customer to foot the bill for basic utility infrastructure is not entirely unheard of, at least in regard to new developments, nor is it per se unreasonable." *Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 211 F.3d 1279 (Table), 2000 WL 525942, *4 n.7 (10th Cir. 2000). Our statement that such requirements are not per se unreasonable is a far

48

cry from Deer Creek's suggestion that such charges are not properly weighed at all. Further, while in *Pittsburg* we considered the propriety of requiring the developer to pay for "basic utility infrastructure," Deer Creek has required Garrett to cover all infrastructure needed to provide service to the Proposed Development, including four new wells. *Id.* As a result, we cannot agree that the district court clearly erred by considering the infrastructure costs imposed on Garrett. Ultimately, Deer Creek's argument that it is common for developers to pay for basic infrastructure does not undermine the district court's conclusion or demonstrate clear error in its findings that requiring Garrett to fund all necessary infrastructure, including four new wells, will yield more than a fair profit to Deer Creek.

Third, Deer Creek argues its conditions for service do not allow it to yield more than a fair profit because Deer Creek credits the impact fees back to Garrett to offset the cost of drilling the water wells. As discussed, the district court found "the impact fee represents the customer's pro rata share of the cost of the wells and related infrastructure necessary to supply water to the customer." App. Vol. VIII at 2001. But rather than requiring Garrett to pay the impact fee for each lot, Deer Creek conditions service on Garrett paying for the *actual* cost of digging the wells and building the infrastructure necessary to supply water to the Proposed Development. That is, rather than setting a limit on the amount Garrett will be required to pay to obtain water service at the Proposed Development, Deer Creek insists Garrett pay whatever the actual cost may be. The district court found the estimated $325,000 Garrett will be required to pay over the amount of the total impact fee represents a

49

profit to Deer Creek by exempting it from any expense to provide wells or related infrastructure to supply water to the Proposed Development. In addition, this condition shifts all risk in providing water to Garrett, while providing all control and ownership to Deer Creek. On appeal, Deer Creek offers no reason why it was clear error for the district court to include this amount in its analysis of the *Ellsworth* factors. Instead, Deer Creek relies on evidence that a different developer paid the impact fee and still was able to profit on its development. While that may be true, it does not undermine the district court's conclusion with respect to Deer Creek's profit in relation to the conditions imposed on Garrett's Proposed Development.

Fourth, Deer Creek contends the district court failed to adequately consider the costs it will incur to maintain the system in perpetuity. We agree the long-term costs of maintaining a water system impact whether a rural water association will yield more than a fair profit based on conditions for service. We further agree that the district court did not consider Deer Creek's long-term costs to maintain service to the Proposed Development when evaluating Deer Creek's potential profit based on the conditions for service. Although in some circumstances the district court's failure to consider these costs may leave the factor unsupported, here the failure is appropriately attributed to Deer Creek because it did not present sufficient quantifiable evidence of these costs.

Deer Creek presented testimony from Ms. Wells-Bethel that long-term maintenance would include "redrilling [the wells] on an average" of every twenty years. App. Vol. IX at 2404. Importantly, she made no attempt to quantify these costs

50

or to translate them into present money values. Ms. Wells-Bethel also testified the subdivision will be "much, much more expensive than any maintenance we do in a rural area" because this maintenance involves "repairing lines under driveways and sidewalks." *Id.* at 2374. Although this testimony demonstrates there will be costs involved in maintaining the water system for the Proposed Development in perpetuity, it does not provide quantifiable evidence to include in the overall calculation of Deer Creek's profit based on its conditions for service. Without quantifiable evidence of the long-term cost of providing water service to the Proposed Development, we cannot conclude the district court erred in determining Deer Creek will make "more than a fair profit" under the conditions imposed.

At bottom, the district court's finding that Deer Creek's conditions allow it to yield more than a fair profit is supported by the record. Deer Creek will receive membership fees, four new wells, water and surface rights, and new water mains with a two-year maintenance bond, all at no cost to Deer Creek. And if the Proposed Development is completed, Deer Creek will add 510 new members, who will pay for water service at a profit to Deer Creek. Although the district court erred in relying on profit from hypothetical water sales based on the slight 0.29 psi increase created by the wells, its other findings are sufficient to support its conclusions. Likewise, where Deer Creek failed to provide any quantifiable evidence of what the long-term maintenance costs of the system will be, the district court did not err in excluding that amount from its analysis. The district court's findings that Deer Creek conditions service on Garrett paying more than the pro rata share of the wells and infrastructure

necessary to supply water to the Proposed Development, while Deer Creek continues to sell water to 510 new customers at a 22% profit, are supported by the record. Based on these findings, we cannot say the district court erred in concluding the first *Ellsworth* factor—whether the challenged practice allows the association to yield more than a fair profit—weighs in favor of Garrett.

> b.      *Rate disproportionate to the services rendered*

The second *Ellsworth* factor asks "whether the practice establishes a rate that is disproportionate to the services rendered." *Ellsworth*, 243 F.3d at 1271. In reaching its conclusion that this factor weighed in favor of Garrett, the district court evaluated only the "initial service[s] to be performed by Deer Creek in connection with establishing water service for the Proposed Development." App. Vol. VIII at 2011. The district court then determined "the only initial service . . . which involves an expense to Deer Creek[] is the setting of water meters at each lot." *Id.* Relying on the findings that each water meter costs approximately $150–$300 and the membership fee covered this cost, the district court concluded "the rate charged—as represented primarily by the membership fee per lot—is disproportionate to the services rendered." *Id.* at 2011–12.

Deer Creek argues the district court's focus on the membership fees to determine this factor was erroneous. Specifically, Deer Creek argues "the 'service[] rendered' [by Deer Creek] is the provision of water service in perpetuity to a 510-lot subdivision, not simply setting a water meter." Appellant's Br. at 42. Deer Creek argues the evidence demonstrates it will provide "back-end costs" of service such as

52

"water meter break[s], water line leak[s], and water well[] . . . reworking or redrilling." *Id.* at 43. Because the district court did not consider these services as included in the rate Garrett is charged, Deer Creek argues it erred in concluding this factor weighed in favor of Garrett. We agree that the long-term provision of water service was an appropriate consideration.

The *Ellsworth* factors require the district court to determine the services provided by a rural water association. *Ellsworth*, 243 F.3d at 1271. The evidence is undisputed that once the system is connected, and after the two-year maintenance bond expires, Deer Creek is required to pay for maintaining the system in perpetuity. App. Vol. VIII at 2005–06 (finding Deer Creek will "assume[] responsibility for maintenance of the water lines" after the bond expires, "be required to maintain the new water wells and water lines (after the expiration of the maintenance bond)," and "will also pay for future infrastructure improvements to the system"). Accordingly, the district court should have included Deer Creek's long-term service obligation in its analysis of whether the rate charged by Deer Creek is disproportionate to the services provided. But here, Deer Creek provided little evidence about the costs to Deer Creek of providing those long-term services. As discussed, Ms. Wells-Bethel's testimony lacks enough specificity to permit a comparison between the costs of providing perpetual water services to the rate charged by Deer Creek. Therefore, while we agree the services provided by Deer Creek include its obligation to maintain the system and to provide water to the Proposed Development long after the

53

installation is complete, we cannot conclude the district court erred where the record lacks evidence from which it could quantify that obligation.

c.      *Similarly situated associations*

Under the third *Ellsworth* factor, courts look to "whether other, similarly situated [associations] do not follow the practice." *Ellsworth*, 243 F.3d at 1271. The district court concluded this factor weighed in favor of Garrett. The court compared similarly situated water providers identified by each party's expert and relied on testimony from both experts "that they are not aware of water providers, other than Deer Creek, which require a customer to drill its own wells as a condition of receiving service." App. Vol. VIII at 2012. The court also found Deer Creek's impact and membership fees to be "significantly higher" than the same fees assessed by similar water service providers. *Id.* at 2012–13.

Deer Creek argues the court erred in concluding this factor weighed in favor of Garrett but concedes that "neither expert knows of another water provider that requires customers to drill wells as a condition of service." Appellant's Br. at 44. This well construction condition was at the center of the parties' dispute and was estimated to cost between $1,600,000 and $2,000,000. The parties also disputed the risk associated with digging test holes, test wells, and digging wells with water of sufficient quantity and quality. Where no other similarly situated service provider identified by either party also required well drilling as a condition for water service, the record supports the district court's conclusion as to this *Ellsworth* factor.

54

Moreover, the district court's finding that similarly situated water providers do not charge both a membership fee and an impact fee or charge rates as high as Deer Creek charges is supported by the record. Of the eighteen water providers Deer Creek and Garrett presented as comparators, only five charged both an impact fee and a membership fee. And Deer Creek's combined fees are the highest of the five providers that do charge both fees, exceeding the highest reported combined fee by over $1,000. Accordingly, the district court's conclusion that this factor weighs in favor of Garrett is not clearly erroneous.

### d.      Arbitrary classification

The final *Ellsworth* factor is "whether the practice establishes an arbitrary classification between various users." *Ellsworth*, 243 F.3d at 1271. The district court concluded this factor weighed in favor of Garrett. Although the conditions Deer Creek offered to Garrett were consistent with its standard policies for subdivisions, the district court found that "not all members are required to do these things as a condition of service." App. VIII at 2014. It also noted "Deer Creek has paid some but not all of its members in exchange for their water or surface rights." *Id.* Because Deer Creek "failed to adequately account for the differential treatment between its members," the district court concluded the conditions establish an arbitrary classification between subdivision users. *Id.*

Deer Creek challenges this finding on appeal, arguing the evidence produced at trial demonstrated Deer Creek's classification between residential users and subdivision users was not arbitrary. Instead, Deer Creek asserts the classifications

55

"exist because there is a substantial difference between the impact of the addition of a single home or business and the impact of large, dense development." Appellant's Br. at 47. The subdivision policy, Deer Creek argues, is the same for all developer customers. In each instance where it paid for water or surface rights, Deer Creek notes it was to acquire them from a non-member landowner or an individual residential member, not a developer.

The record supports Deer Creek's position that it has a policy distinguishing between residential and developer customers. But Deer Creek provided little explanation for the distinction as it relates to transferring water rights. While Deer Creek's subdivision policy requires developers to provide Deer Creek water rights at no cost, the record indicates residential members are not required to transfer their water rights to Deer Creek and that at least three individual members were paid for their water rights.

Indeed, the evidence suggests that the policy for when Deer Creek would pay for water rights was arbitrary. Ms. Wells-Bethel testified that not all Deer Creek's customers were required to fulfill the same conditions to obtain water service:

> Q. All right. Is it true that not all members have to transfer their water rights to Deer Creek?
> A. Yes.
> Q. Okay. And is it true that not all members have to transfer well locations to Deer Creek?
> A. Because of the location of their properties, yes, sir, that is true.
> Q. And is it true that, as we talked about earlier, some members get paid for water rights? Right?
> A. We have apparently had three.
> [. . .]

Q. And Deer Creek unilaterally decides who has to do these things [including transferring water rights, and transferring water rights at no cost to Deer Creek] and who does not; right?
A. It's only based on need.
Q. Well, but it's based on Deer Creek's decision of whether they think it's needed; right?
A. No, sir. Most of it is obvious need.

App. Vol. IX at 2365–66. Unsurprisingly, the district court found Deer Creek's "obvious need" standard to be unenlightening in terms of when a transfer of water rights would be required and whether Deer Creek would pay for those rights. App. Vol. VIII at 2014.

Deer Creek also did not provide an explanation for requiring developers to furnish water rights to Deer Creek without payment but allowing residential members to keep their water and surface rights or even paying members for those rights. Although Deer Creek points to the substantial difference between the impact of adding a single home to the system and the impact of adding a 510-home development, it has not explained how this difference in impact affects the dedication of water rights. In other words, Deer Creek has not explained why individual members may retain or be paid for their water rights while Garrett must dedicate its water rights at no cost.

Accordingly, the district court's finding that Deer Creek's conditions create arbitrary classifications between members is supported by the record.

e.    *Conclusion*

Considering the four *Ellsworth* factors under the totality of the circumstances, we cannot conclude the district court erred in determining Deer Creek's conditions

57

for service are unreasonable, excessive, and confiscatory. Deer Creek did not introduce quantifiable evidence demonstrating the long-term costs to maintain water service to the Proposed Development such that it could be considered in determining the first or second *Ellsworth* factor. And even without the presumption of excess water sales due to the 0.29 psi increase, the district court's conclusion that Deer Creek's conditions for service allow it to yield more than a fair profit is supported by two findings. First, Deer Creek conditioned service on Garrett paying the actual cost—instead of only its pro rata share of the cost—of the wells and necessary infrastructure. This condition allows Deer Creek to profit from water sales to the Proposed Development without bearing any of the initial costs or risk to initiate service. Second, the court relied on the finding that Deer Creek was already selling water at a 22% profit that would translate to an additional $96,000 if the 510 new members were added. Where other water associations do not shift the actual cost and risk of well building to customers, the totality of the circumstances supports the court's conclusion that Deer Creek's conditions are unreasonable, excessive, and confiscatory.

## III.    CONCLUSION

For these reasons, we AFFIRM the district court's final judgment.

Entered for the Court

Carolyn B. McHugh
Circuit Judge